557 S.E.2d 254

James T. **WELLMAN** and Grace **Wellman, Plaintiffs Below,** Appellees

v.

**ENERGY RESOURCES, INC.,** A West Virginia Corporation, Defendant Below, Appellant.

No. 28209.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 10, 2001.

Decided July 6, 2001.

Charles B. Dollison, Gary O. Kinder, Bowles Rice McDavid Graff & Love, PLLC, Charleston, for appellees.

O. Reginald Osenton, Dwayne J. Adkins, Osenton & Adkins, LLP, Logan, for appellant.

McGRAW, Chief Justice:

This is an appeal by Energy Resources, Inc. from an order of the Circuit Court of Logan County granting James T. Wellman and Grace Wellman summary judgment in an action arising out of two oil and gas leases. In granting summary judgment, the circuit court found that the evidence adduced demonstrated that Energy Resources, Inc. had breached the leases and found that the leases had been terminated. The court also awarded the Wellmans substantial damages. On appeal, Energy Resources, Inc., claims that the circuit court erred in granting summary judgment, in declaring the termination of the leases, and in awarding the Wellmans damages.

## I.

## FACTS

The appellees in this proceeding, James T. Wellman and Grace Wellman, owned the oil and gas underlying two tracts of real estate containing 200 acres and 23.5 acres located in Logan County, West Virginia. They had acquired their interests from James T. Wellman's father, Benny Wellman. Prior to the transfer of the interests in the oil and gas to James T. and Grace Wellman, Benny Wellman had entered into two oil and gas leases covering the two tracts with Energy Resources, Inc., the appellant in the present proceeding. For all purposes relating to the present proceeding the leases were identical.

The leases contained certain provisions which are critical to issues in the present case. First, they provided that they would run for a term of ten years and for so long thereafter as drilling or working operations for oil or gas were conducted, or for so long as oil or gas were produced from the leased premises. Specifically, the leases provided that Energy Resources, Inc. was:

TO HAVE AND TO HOLD said premises for the purposes aforesaid during the term of ten (10) years from the date hereof (called "primary term"), and as long thereafter as drilling or reworking operations for oil or gas are conducted thereon as hereinafter provided, or oil or gas produced therefrom, or this lease is extended by any subsequent provision hereof.

Each lease also provided that Energy Resources, Inc. would commence operations for the drilling of one well on or before January 1, 1993, or during the primary term of the lease. Specifically, the leases stated:

Lessee agrees to commence operations for the drilling of one (1) well on said premises on or before January 1, 1993 or thereafter during the primary term hereof to pay to Lessor, in advance, a rental of the rate of One Dollar ($1.00) per acre for each twelve (12) month period until one (1) well is commenced or this lease is surrendered.

The leases required Energy Resources, Inc., to pay a royalty on any oil or gas produced. The royalty provision stated:

Lessee agrees to deliver to Lessor, in tanks, tank cars, or pipe line, a royalty of one-eighth (1/8) of all oil produced and saved from the premises, and to pay to Lessor for gas produced from any oil well and used by Lessee for the manufacture of gasoline or any other product as royalty

one-eighth (1/8) of the market value of such gas at the mouth of the well; is [if] such gas is sold by the Lessee, then as royalty one-eighth (1/8) of the proceeds from the sale of gas as such at the mouth of the well where gas, condensate, distillate or other gaseous substance is found.

Each lease also contained a "right to cure" or "judicial ascertainment clause." Those clauses, which were identical, stated:

This lease shall never be forfeited or terminated for failure of Lessee to perform in whole or in part any of its express or implied covenants, conditions or obligations until it shall have been first finally judicially determined that such failure exists, and Lessee shall have been given a reasonable time after such final determination within which to comply with any such covenants, conditions or obligations.

Prior to the time Energy Resources, Inc. entered into the leases for the two tracts, a natural gas well had been drilled on the 23.5 acre tract under a prior lease granted to a different lessee on April 29, 1954.[1] However, by the time Energy Resources, Inc. entered into the leases involved in the present case, that old well had been out of production for many years and that the lease under which it had been drilled, as well as an accompanying lease on the other tract, had been abandoned by the prior lessee.

After Energy Resources, Inc. leased the two tracts, it did not commence the drilling of a well on either tract prior to January 1, 1993, or at any time during the primary terms, as required by its leases. Further, it did not pay the $1.00 per acre per year delay rental which it had obligated itself to pay in its leases. It does appear, however, that it entered the 23.5 acre tract and reworked the previously-abandoned well drilled by the prior lessee and placed it back in operation in October 1993 after the expiration of the primary term of its leases with the Wellmans. The gas produced from this well was not used for the manufacture of gasoline or any other product. Instead, it was sold as natural gas to Mountaineer Gas Company. The well produced natural gas until it was turned off in November 1998. For the gas taken from this well, Energy Resources, Inc., paid the Wellmans one-eighth of $.87 for each thousand cubic feet of gas which it had sold. In arriving at the $.87 per thousand cubic feet base figure, it took the position that it had deducted certain expenses which it had paid from the $2.22 per thousand cubic feet of gas which it had actually received.

By letters dated July 8, 1998 and September 18, 1998, the Wellmans notified Energy Resources, Inc. that it was in default under the oil and gas leases for failing to drill new wells and for failing to pay proper royalties. The Wellmans gave Energy Resources, Inc. a period of 30 days to cure these defaults. Energy Resources, Inc. did not respond to the demands, and the Wellmans instituted the present action on December 8, 1998. In bringing the action, the Wellmans sought not only termination of the leases, but damages for the failure of Energy Resources, Inc., to pay proper royalties from the existing well.

After development of the case, the Wellmans moved for summary judgment, and by order dated January 3, 2000, the Circuit Court of Logan County granted their motion. It its order, the circuit court found that the leases had terminated by their own terms due to the failure of Energy Resources, Inc., to drill a well on each lease, due to its failure to pay delay rentals, and due to its failure to pay a proper one-eighth royalty on the production from the reworked well. The court also awarded the Wellmans substantial damages because of the failure of Energy Resources, Inc., to pay the Wellmans proper royalties on the gas extracted from the existing well. In awarding the damages, the court concluded that Energy Resources, Inc., did not show that it was entitled to deduct the expenses from the $2.22 per thousand cubic feet of gas which it had received and that it had, in effect, short-changed the Wellmans by improperly charging them with the expenses. The court also awarded the Well-

---

1. Energy Resources, Inc., argues that it is not clear which parcel the well was located on. However, a plat filed with the Oil and Gas Division of the West Virginia Department of Mines, which is included in the record, together with other evidence, shows that the well was on the 23.5 acre tract.

mans prejudgment interest, post-judgment interest, and attorney fees and costs.

In the present proceeding, Energy Resources, Inc. claims that the circuit court erred in granting summary judgment and that the court erred in awarding damages without allowing a jury to determine the appropriate balance due. It also claims that the circuit court erred in refusing to allow it to deduct expenses before computing royalties payable, and that it erred in awarding the Wellmans their attorneys fees.

## II.

### STANDARD OF REVIEW

■ In Syllabus Point 1 of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), this Court stated that: "A circuit court's entry of summary judgment is reviewed *de novo.*"

Additionally, in Syllabus Point 4 of *Aetna Casualty & Surety Company v. Federal Insurance Company of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963), the Court stated that: "If there is no genuine issue as to any material fact summary judgment should be granted but such judgment must be denied if there is a genuine issue as to a material fact."

## III.

### DISCUSSION

*Questions Relating to the Termination of the Lease The "Right to Cure" or "Judicial Ascertainment Clause" Problem*

■ Two of the assignments of error raised by Energy Resources, Inc., relate to the circuit court's determination that the leases which it had entered into with James T. and Grace Wellman terminated under the circumstances of the case. Energy Resources, Inc., points out that the leases contained what it calls "right to cure" clauses which provided that:

This lease shall never be forfeited or terminated for failure of Lessee to perform in whole or in part any of its express or implied covenants, conditions or obligations until it shall have been first finally judicial-

ly determined that such failure exists, and Lessee shall have been given a reasonable time after such final determination within which to comply with any such covenants, conditions or obligations.

Energy Resources, Inc., claims that because of the "right to cure" clauses, the circuit court could not declare the leases terminated until the court had first finally judicially determined that it had failed to meet its obligations and until after it had been given an additional reasonable time, after such final judicial determination, to comply with its obligations. In effect, it argues that it must be given a second chance to meet its obligations before a court can judicially terminate its rights.

Although Energy Resources, Inc., refers the to the clauses as "right to cure" clauses, such clauses have been referred to by commentators on oil and gas law as "judicial ascertainment" clauses. *See, e.g.,* 4 Howard R. Williams & Charles J. Myers, *Oil and Gas Law* § 681, *et seq.* (2000); and 4 Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 53.4(c) (1990).

Although both these commentators suggest that these clauses "should" be held valid in limited circumstances, a review of the actual cases involving their validity shows that courts have been concerned with them, and held them to be invalid.

In a seminal case involving such clauses, the Texas court stated:

We think this stipulation [clause] is void. If its terms were observed, Meers and wife [the lessors] would be required to file a suit in the district court for the purpose of adjudicating the questions as to whether there had been a breach of any implied obligation and whether oil and gas was being produced in paying quantities. By the terms of the stipulation, that would end the suit, even though the facts should be determined against the lessees. The court would be precluded from rendering judgment upon such findings. Except in certain instances prescribed by statute, courts do not try cases by piecemeal.

*Frick–Reid Supply Corporation v. Meers*, 52 S.W.2d 115, 118 (Tex.Civ.App.1932). The court then proceeded to state:

> Observance by the court of the terms of this stipulation would require a trial in which only the facts named in the stipulation could be judicially ascertained. Upon the determination of such facts, the lessee, according to the stipulation, is given a reasonable time thereafter to comply with his obligations or surrender the lease.... This would require at least two trials and two final judgments. It would require, ... a postponement of the rendition and entry of the judgment upon the facts ascertained, subject to the option and caprice of the lessee. Agreements relating to proceedings in civil cases and involving and providing for anything inconsistent with the full and impartial course of justice therein are illegal. 2 Elliott on Contracts, 719. While both common-law and statutory arbitrations are favored by the courts, and questions of fact may be conclusively settled in that way, the parties cannot by original contract or otherwise convert the trial and appellate courts into mere boards of arbitration.

*Id.* at 118. *See also, Lamczyk v. Allen*, 8 Ill.2d 547, 134 N.E.2d 753 (1956); *Smith v. Sun Oil Company*, 172 La. 655, 135 So. 15 (1931); *Waddle v. Lucky Strike Oil Company*, 551 S.W.2d 323 (Tenn.1977); and *Guerra v. Chancellor*, 103 S.W.2d 775 (Tex.Civ.App. 1937).

A second objection to "judicial ascertainment" clauses is that often in the oil and gas lease situation, the landowner is a relatively small operator with limited resources and the lessee often has substantially greater resources. "Judicial ascertainment" clauses in such situations might enable the lessee to subject the lessor to needless and unfair pressure to obtain concessions. As stated in *Melancon v. Texas Company*, 230 La. 593, 624, 89 So.2d 135, 146 (1956):

> To hold as contended by counsel for defendant on this point would lead to an anomalous, if not ridiculous, situation, for the lessor would be at the mercy of the lessee; the latter might employ whatever tactics he saw fit to obtain concessions or alterations in connection with the lease, knowing it would never be declared canceled without his first being given the opportunity to comply after judicial proceedings.

■ Finally, it has been broadly recognized that "judicial ascertainment" clauses do not affect termination of a lease by abandonment in those jurisdictions which, like West Virginia, are termination by abandonment states. *See* 4 Howard R. Williams & Charles J. Myers, *Oil and Gas Law* § 682.3 (2000); and Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 53.4(c) (1990).[2]

> Such an interest automatically terminates by its own terms upon the occurrence of the stated event, namely, expiration of the primary term without production or operations at such time, or the cessation of production or operations during the secondary term. Such a habendum clause does *not* convey an interest subject to a condition subsequent, with the lessor having the optionally exercisable power of declaring a forfeiture upon nonproduction or cessation of production. Instead, the lessor has a possibility of reverter and does not need to take any affirmative action for the lease to terminate.

*Id.* at 644, 346 S.E.2d at 794.

The rationale for holding that a "judicial ascertainment" clause has no effect on termination in a termination by abandonment state appears to be that the fundamental character of an oil and gas lease in a termination by abandonment state is both that of a conveyance and a contract and that the parties cannot eliminate the conveyance aspect of the arrangement by imposing a condition repugnant to the habendum clause. As stat-

---

**2.** States which recognize that a lease may terminate automatically by abandonment, or by failure to pay delay rentals or by failure to produce oil and gas in paying quantities, have rejected the idea that the "judicial ascertainment clause" will prevent the termination of an oil and gas lease by abandonment. As stated in 4 Howard R. Williams & Charles J. Myers, *Oil and Gas Law* § 682.3 (2000):

> In states which take the view that the interest of an oil and gas lessee is subject to abandonment, the question sometimes arises as to the effect on abandonment of a ... judicial ascertainment clause in the lease. [In such states] [i]t has been held that abandonment may occur without ... judicial ascertainment.

It is rather clear that West Virginia is a termination by abandonment state. As explained in *McCullough Oil, Inc. v. Rezek*, 176 W.Va. 638, 346 S.E.2d 788 (1986), a West Virginia lease providing that it shall continue "so long as" production in paying quantities or operations therefor continue, or similar language, conveys a "determinable" interest.

West Virginia, like other jurisdictions, has recognized that economy of judicial effort is a public policy concern. *See, e.g., State ex rel. Sowards v. County Commission of Lincoln County*, 196 W.Va. 739, 474 S.E.2d 919 (1996); *Glover v. Narick*, 184 W.Va. 381, 400 S.E.2d 816 (1990); and *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969). West Virginia has also long adhered to the ancient legal principle that *Nemo debet bis vexari pro una et eadem causa,* or that no one should be twice vexed by one and the same cause, or, more freely translated, that one should not have to undergo repeated litigation over the same matter. *Byus Mankin Lumber Company v. Landes Construction Company*, 109 W.Va. 667, 156 S.E. 71 (1930). Finally, the Court believes that the purpose of the legal system is to provide final resolution of legal controversies and not to provide a device to enable one party to grind another down through repetitious litigation until the other submits.

In short, the Court believes there are compelling public policy reasons for holding that "judicial ascertainment" clauses in oil and

---

ed in *McCullough Oil, Inc. v. Rezek, id.* at 642–44, 346 S.E.2d at 792–94:

> An oil and gas lease (or other mineral lease) is both a conveyance and a contract. It is designed to accomplish the main purpose of the owner of the land and of the lessee (or its assignee) as operator of the oil and gas interests: securing production of oil or gas or both in paying quantities, quickly and for as long as production in paying quantities is obtainable. Analyzed, an oil and gas lease contains traditional conveyancing portions and the usually separate contractual portions. *Montana–Fresno Oil Co. v. Powell*, 219 Cal.App.2d 653, 659, 33 Cal.Rptr. 401, 404 (1963).
>
> One of the conveyancing portions of an oil and gas lease is the "habendum" clause, also known as the "term" clause. The purpose of the habendum clause in an oil and gas lease (or other mineral lease) is to define and limit the duration of the lessee's estate. R. Donley, *The Law Of Coal, Oil And Gas In West Virginia And Virginia* § 65a. (1951). The habendum clause of [176 W.Va. 643] virtually all contemporary oil and gas leases provides for a relatively short "primary" term, consisting of a fixed period of time of from a few months to five or ten years, at the end of which period there must be production (or in some leases, the prosecution of drilling operations); the habendum clause also provides that the lease may be preserved for an indefinite period of time beyond the expiration of the primary term "as long thereafter" as oil or gas is produced in paying quantities (or in some leases, for as long thereafter as operations for oil or gas are being conducted). 3 H. Williams, *Oil And Gas Law* § 601.4 at 9–10 (1985). *See also* R. Donley, *The Law Of Coal, Oil And Gas In West Virginia And Virginia* § 69 (1951).
>
> \*\*\*
>
> A habendum clause in an oil and gas lease (or other mineral lease) providing for a short primary term and a secondary term for "so long as" production in paying quantities or operations therefor continue, or similar language, conveys a "determinable" interest, that is, an interest subject to a special limitation. Such an interest automatically terminates by its own terms upon the occurrence of the stated event, namely, expiration of the primary term without production or operations at such time, or the cessation of production or operations during the secondary term. Such a habendum clause does not convey an interest subject to a condition subsequent, with the lessor having the optionally exercisable power of declaring a forfeiture upon nonproduction or cessation of production. Instead, the lessor has a possibility of reverter and does not need to take any affirmative action for the lease to terminate.

Although *McCullough Oil, Inc. v. Rezek, id.,* did not deal with a "judicial ascertainment clause," it did deal with a related-type clause, call a notice and demand clause, sometimes inserted in a lease, which provides that the lease will not terminate until the lessor has given the lessee notice of a default and until the lessor makes a demand that the lessee correct the default. In *McCullough Oil, Inc. v. Rezek, id.,* the Court concluded that a notice and demand clause in an oil and gas lease or other mineral lease has no effect upon the habendum clause or the cessation clause of the lease. The Court indicated that the notice and demand clause relates to express and implied contractual obligations of the lessee under the lease, and relates to forfeiture of the lease for breach of those contractual obligations. It does not apply to termination by abandonment. The Court stated:

> [T]he notice and demand clause does not relate to termination or expiration of the lease upon the occurrence of the estate-limiting event stated in the habendum clause or cessation of production clause.

*Id.* at 645, 346 S.E.2d at 796.

The Court also stated:

> Thus, the lessee (or its assignee as operator) is not entitled to notice before the lease terminates automatically under the habendum clause or the cessation of production clause of an oil and gas lease (or other mineral lease). Furthermore, once the lease automatically terminates, requiring notification of the lessee would be a superfluous act, for the lessee could not unilaterally revive the lease.

*Id.* at 645–46, 346 S.E.2d at 796.

gas leases, which, in effect, open the door for repeated litigation over the same issues, are not enforceable on this State. On the other hand, the Court can see no reason for holding them enforceable.

■ In view of this, and in view of the fact that other jurisdictions have rejected such clauses, this Court holds that "judicial ascertainment" clauses in oil and gas leases in West Virginia are void under the public policy of this State and do not preclude a court in which a controversy over an oil and gas lease is tried from rendering a final judgment and finally resolving that controversy.

In light of this, this Court concludes that the claim of Energy Resources, Inc., that the "judicial ascertainment" clauses in the leases in question in the present case precluded the circuit court from declaring its leases forfeited is without merit.

### The Factual Basis for Termination

The second claim made by Energy Resources, Inc., relating to the circuit court's declaration that the leases were terminated, is that the facts do not show conclusively that it has committed acts precipitating termination and that, under the circumstances, the trial court erred in entering summary judgment against it.

Specifically, Energy Resources, Inc., claims that at the time the circuit court entered summary judgment, there was a question of fact as to whether the existing well from which it produced oil was on the 200 acre tract or the 23.5 acre tract. In reviewing the record, the Court notes that various plats were introduced including "Well Location Map File No. Log–466," which was filed with the Oil and Gas Division of the West Virginia Department of Mines in conjunction with the drilling of the well. Contrary to the assertions of Energy Resources, Inc., that plat, in conjunction with the other evidence in the case, indicates that the existing well was located on the 23.5 acre tract. That evidence was not contradicted.

Another claim made by Energy Resources, Inc., is that: "Throughout their summary judgment motion and the Final Judgment Order there are factual assertions that no delay rentals were paid. However, the record is silent concerning the payment of delay rental." Contrary to this assertion, this Court finds that in the supplemental affidavit of James Wellman in support of the Wellmans' motion for summary judgment, it is plainly stated that: "ERI [Energy Resources, Inc.] has not drilled a well on my property. ERI has never paid me any 'delay rentals' as required by the two oil and gas leases." This is not contradicted by counter-affidavit or any other evidence.

Energy Resources, Inc., also claims that there is a question of fact as to whether its conduct was wilful. In this Court's view, the conduct is factually developed on the record. The question of wilfulness is, the Court believes, one of interpretation.

Finally, Energy Resources, Inc., claims that there is a question of fact as to whether it pooled or unitized the two leases which it had from the Wellmans. It claims that if it did, its production from the old well on the 23.5 acre tract preserved its interest in both leases. The Court notes that no evidence of pooling or unitization was presented to the circuit court. Further, it is clear that Energy Resources, Inc., breached at least its covenant to drill a new well on each tract by January 1, 1993, or during the primary terms of the leases, and that under the language of the leases, it was plain that the parties contemplated that the leases could be forfeited or terminated for the failure of Energy Resources, Inc., to perform its covenants under the leases.

■ As has been previously stated, in *Aetna Casualty & Surety Company v. Federal Insurance Company of New York, supra,* the Court indicated that summary judgment was appropriate where there were no genuine issues of fact to be tried. Factually, in the present case, affidavits submitted by James Wellman show that Energy Resources, Inc., paid no delay rentals and no royalties under the lease of the 200 acre tract prior to the institution of the present action. These facts were, in no way, disputed by Energy Resources, Inc. The lease, by its terms, ran only for ten years and for so long thereafter as drilling or reworking operations were conducted. Ten years had expired by the time

the Wellmans brought their action, and by virtue of the habendum clause of the lease, the leasehold had reverted to the Wellmans of its own accord. In short, there were undisputed facts showing that Energy Resources, Inc., abandoned its lease to the 200 acre tract and the circuit court properly entered summary judgment for the Wellmans as to that tract.

The 23.5 acre tract raises a slightly different problem. The undisputed evidence shows that no delay rentals were paid under the lease on that tract. Further, no new well was drilled on the tract. On the other hand, Energy Resources, Inc., did reopen the existing well on the tract. There was thus some production from the tract which might have prevented abandonment. However, an express covenant of the lease covering the tract required Energy Resources, Inc., to commence drilling one well on the tract at least during the primary term of the lease. Further, it is plain from the lease that the lease could be forfeited if Energy Resources, Inc., failed to comply with its covenants.

In its answer to Paragraph 26 of the Wellmans' complaint, Energy Resources, Inc., admitted that "it has not drilled a well on the leased premises and the 10 year primary term has expired." This was reinforced by the deposition testimony of Diane Berman, the agent of Energy Resources, Inc. Further, as will hereafter appear, the evidence shows conclusively that Energy Resources, Inc., did not pay the royalties required under its lease even on the gas produced from the existing well.

In view of all this, this Court cannot conclude that there were material questions of fact relating to the termination of the lease on the 23.5 acre tract or that the circuit court erred in granting summary judgment to the Wellmans relating to that termination.

## IV.

### QUESTIONS AS TO DAMAGES

As has been previously stated, Energy Resources, Inc., did not commence the drilling of wells upon the leases on the Wellmans' property by the time specified in the leases. Energy Resources, Inc., however, did reopen the existing well on the 23.5 acre tract and produced gas from that well for some time. In bringing the present action, the Wellmans asserted that Energy Resources, Inc., did not pay them the appropriate royalties due under the lease on the 23.5 acre tract, and they prayed for damages for the unpaid royalties.

The oil and gas lease on the tract on which the well was located required Energy Resources, Inc., to pay the Wellmans "1/8th of the proceeds from the sale of gas as such at the mouth of the well where gas, condensate, distillate, or other gaseous substance is found" when the gas produced was sold as natural gas.

During the development of the case, a bookkeeper for Mountaineer Gas Company, the purchaser who bought the gas produced by Energy Resources, Inc., stated that Mountaineer Gas Company had paid Energy Resources, Inc., $2.22 per thousand cubic feet of gas sold by Energy Resources, Inc., from the Wellmans' well. This testimony was reinforced by gas production records for the well from Mountaineer Gas Company for the period October 1993 through October 1998. Further evidence showed that Energy Resources, Inc., paid the Wellmans' royalties, not on the basis of $2.22 per thousand cubic feet, but rather on the basis that it had received $.87 per thousand cubic feet. Energy Resources, Inc., does not dispute that it paid royalties on the basis of $.87 rather than $2.22, but it contends that it was entitled to deduct certain expenses from the amounts received from Mountaineer Gas Company before calculating the Wellmans' royalty.

In Robert Donley, *The Law of Coal, Oil and Gas in West Virginia and Virginia* § 104 (1951), it is stated: "From the very beginning of the oil and gas industry it has been the practice to compensate the landowner by selling the oil by running it to a common carrier and paying him [the landowner] one-eighth of the sale price received. This practice has, in recent years, been extended to the situations where gas is found. . . ." The one-eighth received is commonly referred to as the landowner's royalty. In *Davis v. Hardman*, 148 W.Va. 82, 133 S.E.2d 77 (1963), this Court stated that a

distinguishing characteristic of such a royalty interest is that it is not chargeable with any of the costs of discovery and production. The Court believes that such a view has been widely adopted in the United States.

In spite of this, there has been an attempt on the part of oil and gas producers in recent years to charge the landowner with a *pro rata* share of various expenses connected with the operation of an oil and gas lease such as the expense of transporting oil and gas to a point of sale, and the expense of treating or altering the oil and gas so as to put it in a marketable condition. To escape the rule that the lessee must pay the costs of discovery and production, these expenses have been referred to as "post-production expenses." Two states, Texas and Louisiana, have recognized that a lessee may properly charge a lessor with a *pro rata* share of such "post-production" (as opposed to production or development) costs. On the other hand, it appears that a number of other states have rejected this position where a lease, such as the ones in the present case, calls for the payment of royalties on the basis of what the lessee receives from the sale of oil and gas.[3]

The rationale for holding that a lessee may not charge a lessor for "post-production" expenses appears to be most often predicated on the idea that the lessee not only has a right under an oil and gas lease to produce oil or gas, but he also has a duty, either express, or under an implied covenant, to market the oil or gas produced. The rationale proceeds to hold the duty to market embraces the responsibility to get the oil or gas in marketable condition and actually transport it to market.

Typical of the thinking of courts which have adopted this view is that of the Supreme Court of Colorado in *Garman v. Conoco*, 886 P.2d 652 (Colo.1994). In that case, the court stated that in Colorado a lessee impliedly covenanted to market oil and gas produced. It then stated: "Implied lease covenants related to operations typically impose a duty on the oil and gas lessee. *See, e.g.,* 5 Kuntz § 57.1 to 62.5. Accordingly, the

lessee bears the cost of compliance with these promises. *Cf. Warfield Natural Gas Go. v. Allen,* 261 Ky. 840, 88 S.W.2d 989, 991 (1935)." *Id.* at 659.

The court went on to reason that since the lessee, under its covenant, had a duty to market oil and gas produced, and since under the law it was required to pay the costs to carry out its covenants, it had the duty to bear the cost of preparing the oil and gas for market and to pay the cost of transporting them to market. The court also noted that, in similar ways, other jurisdictions had adopted the rule that the lessee had to bear post-production costs. The court stated:

> In Kansas and Oklahoma a ... rule has developed based on an operator's implied duty to market gas produced under an oil and gas lease. *Wood v. TXO Production Corp.,* 854 P.2d 880, 882 (Okla.1992) ("[T]he implied duty to market means a duty to get the product to the place of sale in marketable form."); *Gilmore v. Superior Oil Company,* 192 Kan. 388, 388 P.2d 602, 606 (1964) ("Kansas has always recognized the duty of the lessee under an oil and gas lease not only to find if there is oil and gas but to use reasonable diligence in finding a market for the product."). Wyoming has codified the marketability approach. The Federal government also requires that a lessee "place gas in marketable condition at no cost to the Federal Government...." 30 C.F.R. § 206.153(I) (1993).

> Arkansas and North Dakota have reached similar conclusions when considering lease royalty clauses which are silent as to allocation of post-production costs. A lease which provides for the lessor to receive "proceeds at the well for all gas" means gross proceeds when the lease is silent as to how post-production costs must be borne. *Hanna Oil & Gas Co. v. Taylor,* 297 Ark. 80, 759 S.W.2d 563, 565 (1988); *see also West v. Alpar Resources, Inc.,* 298 N.W.2d 484, 491 (N.D.1980) (when the lease does not state otherwise lessors are entitled to royalty payments based on per-

---

**3.** Where leases call for the payment of royalties based on the value of oil or gas produced, and sold directly, the Court perceives that there are

possibly different issues, and they are excluded from this discussion.

centage of total proceeds received by the lessee, without deduction for costs).

*Garman v. Conoco, Inc.*, 886 P.2d 652, 658 (1994).

■ This Court believes that the rationale employed by Colorado, Kansas, and Oklahoma in resolving the question of whether the lessor or the lessee should bear "post-production" costs is persuasive. Like those states, West Virginia holds that a lessee impliedly covenants that he will market oil or gas produced. *See* Robert Tucker Donley, *The Law of Coal, Oil and Gas in West Virginia and Virginia* §§ 70 & 104 (1951). Like the courts of Colorado, Kansas, and Oklahoma, the Court also believes that historically the lessee has had to bear the cost of complying with his covenants under the lease. It, therefore, reasonably should follow that the lessee should bear the costs associated with marketing products produced under a lease. Such a conclusion is also consistent with the long-established expectation of lessors in this State, that they would receive one-eighth of the sale price received by the lessor.

■ In view of all this, this Court concludes that if an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale.

■ Further, the obvious object of a legal trial is that a court adjudicate a controversy based upon evidence developed in accordance with the rules of law. In line with this, the Court concludes that if an oil and gas lease provides that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, the lessee shall be entitled to credit for those costs to the extent that they were actually incurred and they were reasonable. Before being entitled to such credit, however, the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable.

■ Although this Court believes that the language of the leases in the present case indicating that the "proceeds" shall be from the "sale of gas as such at the mouth of the well where gas ... is found" might be language indicating that the parties intended that the Wellmans, as lessors, would bear part of the costs of transporting the gas from the wellhead to the point of sale, whether that was actually the intent and the effect of the language of the lease is moot because Energy Resources, Inc., introduced no evidence whatsoever to show that the costs were actually incurred or that they were reasonable. In the absence of such evidence, this Court believes that the trial court properly granted the Wellmans summary judgment on the cost issue and that Energy Resources, Inc.'s, claims relating to the court's actions on this point are without merit.

## V.

### REMAINING ISSUES

Another claim made by Energy Resources, Inc., is that the Circuit Court of Logan County erred in failing to enter an order requiring the Wellmans to return its property which was used in conjunction with the operation of the well upon the 23.5 acre tract. As an alternative, Energy Resources, Inc., claims that it should have been allowed a set off in an amount equal to the fair market value of the equipment against the judgment rendered against it.

Oil and gas leases commonly contain a clause referred to as a "removal of equipment clause." This clause normally provides that the lessee under the oil and gas lease shall have the right at any time to remove all machinery and fixtures placed on the premises, including the right to draw and remove casing. *See* 4 Eugene Kuntz, *A Treatise of the Law of Oil and Gas* § 50.3 (1990). Even where there is no "removal of equipment clause," courts have generally recognized that equipment placed on an oil and gas lease by the lessee should be classified as trade fixtures. 4 Eugene Kuntz, *A Treatise of the Law of Oil and Gas* § 50.3(a), *and see Gartland v. Hickman*, 56 W.Va. 75, 49 S.E. 14 (1904). As business fixtures, the equipment

does not become part of the real estate leased and ordinarily may be removed for a reasonable time following the termination of the lessee's interest in the premises. *Gartland v. Hickman, id.*

In spite of these general propositions, there are limitations on a lessee's right to remove equipment. In *Howell v. Appalachian Energy, Inc.*, 205 W.Va. 508, 519 S.E.2d 423 (1999), this Court stated that if a lessee fails to produce and sell, or produce and use, oil or gas from a leased premises pursuant to an oil and gas lease for greater than 24 months, then the lessee shall be deemed to have abandoned his interest in any oil and gas well equipment placed on the premises.

Additionally, it is widely recognized that whether there is an equipment removal clause or not, a lessee may not remove equipment even if he has abandoned or lost his interest in an oil and gas well if the removal of the equipment destroys a well which is capable of producing. 4 Howard R. Williams & Charles J. Myers, *Oil and Gas Law* § 674.2 (2000). As stated in 4 Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 50.3(c) (1990): "[A] denial of the lessee's right to remove equipment when it will result in destruction of a producing well has been predicated on a protection of the public interest in preventing waste of a natural resource." This proposition has also been stated in Texas: "There is ample authority in Texas supporting the proposition that the owner of the casing does not have the right to ruin or destroy a productive well by taking away the casing. The holdings in these cases seem to be predicated on the theory of public policy of preventing waste of our natural resources." *Patton v. Rogers*, 417 S.W.2d 470, 477 (Tex.Civ.App.1967).

Courts have also recognized that the correlative rights of other owners must be taken into account in determining whether the removal of equipment is appropriate. Thus, it has been stated in Texas that:

> So long as the well is a producer, neither the owner of the well nor the owner of the land would have the right to draw the casing and thereby destroy the well. Since all parties who are interested in the property have an interest in the well, no one would have the right to do any act which would destroy the rights of the co-tenants or co-owners of the property.

*Orfic Gasoline Production Company v. Herring*, 273 S.W. 944, 945 (Tex.Civ.App.1925).

Another authority states: "It seems generally agreed that the lessee (or a claimant through the lessee) is not authorized to destroy a well which is capable of producing in paying quantities." 4 Howard R. Williams & Charles J. Myers, *Oil and Gas Law* § 674.2 (2000).

The West Virginia Legislature has indicated that the policy of this State favors the conservation and maximum recovery of oil and gas. W.Va.Code 22C–9–1. The Court, therefore, holds that in light of the public policy favoring the conservation and maximum recovery of oil and gas, when an oil or gas well remains capable of producing oil or gas at the termination of a lease covering such well, a lessee desiring to remove the well equipment must afford the lessor, or an agent chosen by the lessor, a reasonable opportunity to qualify under the bonding statute of this State, W.Va.Code 22–6–26, to continue the operation of the well. In the event the lessor elects to so qualify, a court, upon application of either party, may determine and order payment for the value of the lessee's well equipment, reduced by the cost of removing such equipment from the leasehold and by the cost of plugging the well assumed by the lessor.

In the present case, the Court believes that the evidence before the circuit court indicates that the existing well on that tract is still capable of producing oil and gas. In light of this, the Court believes that there is a basis for requiring Energy Resources, Inc., to leave its equipment and personal property, provided the Wellmans, or an agent chosen by them, qualifies for the continued production of the well. In such a circumstance, Energy Resources, Inc., might be entitled to an offset for the value of its equipment over the amount of its plugging obligation.

Factually, the record is inadequately developed on the value of the equipment on

whether the Wellmans can or wish to qualify as operators of the well, or on what the plugging obligation of Energy Resources, Inc., is. For this reason, the Court believes that the judgment of the circuit court, insofar as it relates to Energy Resources, Inc.'s claim for its equipment, must be reversed, and the case must be remanded for further development on that issue.

■ Finally, Energy Resources, Inc., claims that the Circuit Court of Logan County erred in awarding the Wellmans their attorney fees.

■ This Court has indicated that an award of attorney fees is appropriate where there has been a willful breach of contract and where a lessor is forced to take legal action against its lessee to recover possession when the lessee improperly holds the lease over after termination. *See TXO Production Corporation v. Alliance Resources Corporation*, 187 W.Va. 457, 419 S.E.2d 870 (1992).

Although Energy Resources, Inc., argues that the Circuit Court of Logan County should have allowed a jury to determine if its breach of the leases involved in this case was willful, intentional, or in bad faith, the evidence in this case rather clearly shows that Energy Resources, Inc., did not commence the drilling of a well under any construction of the evidence on the 200 acre tract involved in this case, and, in this Court's view, the reopening of the existing well on the 23.5 acre tract could not have been construed as the drilling of such a well. Under such circumstances, this Court believes that the evidence shows that Energy Resources, Inc., intentionally breached its obligations under the leases with the Wellmans and that given this fact, the Court properly awarded the Wellmans their attorney fees in this case.

For the reasons stated, the judgment of the Circuit Court of Logan County is affirmed except insofar as it denies Energy Resources, Inc., credit for the equipment left behind on the Wellmans' property; on that point the judgment is reversed, and this case is remanded on it for the circuit court to determine if there is a factual basis for awarding Energy Resources, Inc., an equipment credit, as set forth herein.

Affirmed, in part reversed, in part, and remanded.