FILED

**June 14, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Walker, J., dissenting,

The district court certified four questions to this Court, but we only need to answer the first: whether *Tawney* is "still good law"? The answer is yes in the sense that we have not yet overruled it, but no in the sense this Court wrongly decided it and its predecessor *Wellman*. Five years ago when this Court decided *Leggett*, we highlighted the flawed reasoning in *Wellman* and *Tawney* when we were "compelled to further illustrate the faulty legs upon which [they] and [their] iteration of the marketable product rule purports to stand."[1] *Tawney* was the next step in the illogical path blazed in *Wellman*, and we should take this opportunity to overrule them both.

Before "deregulation," oil and gas sales occurred at the wellhead.[2] After deregulation, lessees started enhancing the "sour" gas removed from lessors' property, transporting it to an off-site location, and selling the "sweetened" gas for more than the market value of the raw minerals.[3] We first addressed the effects of deregulation in

---

[1] *Leggett v. EQT Prod. Co.*, 239 W. Va. 264, 276, 800 S.E.2d 850, 862 (2017).

[2] *Id.* at 271, 800 S.E.2d at 857.

[3] *Id.* at 271-72, 800 S.E.2d at 858-59.

1

*Wellman v. Energy Res., Inc.*,[4] which we later observed formed "the foundation of the current state of West Virginia's law on deduction of post-production costs."[5] And as the law stands under *Wellman*, lessees bear all post-production transportation and enhancement expenses and pay royalty owners based on the proceeds of the enhanced product.[6] So, because of *Wellman*, lessees compensate royalty owners for value beyond the raw minerals that they own, unless they contract otherwise.[7] The *Wellman* Court supported the default rule based on the implied covenant to market, but the decision appears "to arise more from an unwillingness to accept the realities of deregulation in the natural gas market than from implied covenant law."[8]

Tellingly, the *Wellman* Court did not acknowledge the new industry landscape wrought by deregulation. Instead, it focused on what it viewed as

---

[4] 210 W. Va. 200, 557 S.E.2d 254 (2001).

[5] *Leggett*, 239 W. Va. at 272, 800 S.E.2d at 858 (citing *Wellman*, 210 W. Va. 200, 557 S.E.2d 254).

[6] *See Leggett*, 239 W. Va. at 276-77, 800 S.E.2d at 862-63 (citation omitted).

[7] *Id.*

[8] *Id*. at 277, 800 S.E.2d at 863 (quoting John W. Broomes, *Waste Not, Want Not: The Marketable Product Rule Violates Public Policy Against Waste of Natural Gas Resources*, 63 U. Kan. L. Rev. 149, 170–71 (2014)).

2

> an attempt on the part of oil and gas producers in recent years to charge the landowner with a *pro rata* share of various expenses connected with the operation of an oil and gas lease such as the expense of transporting oil and gas to a point of sale, and the expense of treating or altering the oil and gas so as to put it in a marketable condition.[9]

The Court blamed the trend on lessees' efforts "[t]o escape the rule that the lessee must pay the costs of discovery and production . . . [,]"[10] in other words, to escape the implied covenant to market. Before *Wellman*, the implied covenant to market required that "the lessee exercise reasonable diligence to market the products, defined as 'whatever, in the circumstances, would be reasonably expected of all operators of ordinary prudence, having regard to the interests of both lessor and lessee.'"[11] Although the *Wellman* Court chose not to acknowledge deregulation, one cannot ignore the obvious goal of the decision: to grant the benefits of deregulation to lessors while shifting the burden to lessees. And *Wellman* did that by removing the notion that lessees could regard their own interest and, instead, expanded the implied covenant to market to require lessees to bear all expenses of enhancing already discovered and produced minerals and compensate lessors based on the

---

[9] *Wellman*, 210 W. Va. at 210, 557 S.E.2d at 264.

[10] *Id.*

[11] *Leggett*, 239 W. Va. at 272-73 n.12, 800 S.E.2d at 858-59 n.12 (quoting *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 903 (Colo. 2001)).

3

value added post-production. The approach "[is] nothing more than a re-writing of the parties' contract to take money from the lessee and give it to the lessor."[12]

*Wellman* based its interpretation of the implied covenant to market on a section from a 1951 treatise that says

> From the very beginning of the oil and gas industry it has been the practice to compensate the landowner by selling the oil by running it to a common carrier and paying to [the landowner] one-eighth of the sale price received. This practice has, in recent years, been extended to situations where gas is found . . . .[13]

But *Wellman* overlooked another section of the treatise that acknowledges that the implied covenant to market does not extend to minerals sold off-site and that lessees should pay royalties

> equal to one-eighth (1/8) of the proceeds received by the [l]essee from the sale of gas if measured and sold at the well, *but if not sold at the well but after transmission or commingling with gas from other properties, then equal to one-eighth (1/8) of the average prevailing price currently paid at the well in the same field by public utility companies* . . . .[14]

---

[12] *Leggett*, 239 W. Va. at 277, 800 S.E.2d at 863 (quoting David E. Pierce, *Royalty Jurisprudence: A Tale of Two States* 374 (2010)).

[13] *Wellman*, 209 W. Va. at 210, 557 S.E.2d at 263 (quoting Robert Donley, *The Law of Coal, Oil and Gas in West Virginia and Virginia* § 104 (1951)).

[14] Donley, *supra* at § 159 (emphasis added).

It is not clear whether the parties in *Wellman* put the latter rule to the Court. But what is clear is that the latter rule is the logical adaptation of the implied covenant to market in view of deregulation's realties. The *Wellman* Court looked past the realties, extended the implied covenant to market to obligate lessees to cover expenses incurred after discovery and production, and built our jurisprudence on faulty legs.

This Court compounded the flawed reasoning in *Tawney v. Columbia Nat. Res., L.L.C.*[15] There, the Court held that a lease must provide a "method of calculating" post-production expenses if a lessee wishes to contract away *Wellman*'s expanded implied covenant to market.[16] But no court should require parties to contract away an implied covenant, much less impose a heightened burden for doing so. Instead, implied covenants are merely gap fillers courts can use "to implement the parties['] intentions where not otherwise stated[.]"[17] As Petitioners put it, "[t]he fundamental legal flaw underlying *Wellman* and *Tawney* is that they invert the roles of express contractual terms and implied covenants." So, when express terms state that parties will calculate royalties based on

---

[15] 219 W. Va. 266, 633 S.E.2d 22 (2006).

[16] *See* Syl. Pt. 10, *Id.* at 266, 633 S.E.2d at 22.

[17] *Leggett*, 239 W. Va. at 275, 800 S.E.2d at 861.

minerals' value at the wellhead, courts should not supersede the express terms with an implied covenant, which are "only justified on grounds of legal necessity" and should not be at issue where express terms cover the point.[18]  And by adding unprecedented impediments to lessees' freedom of contract—like creating an ambiguous "method of calculating" requirement—it seems this Court doubts this State's mineral owners' ability to contract for themselves.  The heightened requirements undermine the basic underpinning of contract law that "[i]t is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them."[19]  In other contexts, this Court has lamented impediments to contractual freedom and deemed the public policy to outweigh countervailing policy concerns:

> [Persons] of full age and competent understanding shall have the utmost liberty of contracting, and . . . their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice. Therefore, you have this

---

[18]  *See Id.* (quoting *Allen v. Colonial Oil Co.*, 92 W. Va. 689, 115 S.E.2d 842, 844 (1923)).

[19]  Syl. Pt. 3, *Cotiga Dev. Co. v. United Fuel & Gas Co.*, 147 W. Va. 484, 128 S.E.2d 626 (1962).

paramount public policy to consider,—that you are not lightly to interfere with this freedom of contract.[20]

Next, the question is whether the principle of stare decisis limits our ability to correct what I believe are the errors of the past. And this Court's approach to precedent supports correcting the flawed reasoning that started in *Wellman* and continued in *Tawney*. As we have explained, stare decisis is flexible when this Court erroneously decided cases or when an outmoded rule should not apply to changed circumstances:

> Stare decisis is not a rule of law but is a matter of judicial policy . . . . It is policy which promotes certainty, stability and uniformity in the law. It should be deviated from only when urgent reason requires deviation. However, stare decisis is not an inflexible policy. In the rare case when it clearly is apparent that an error has been made o[r] that the application of an outmoded rule, due to changing conditions, results in injustice, deviation from that policy is warranted.[21]

We follow the guidance of Supreme Court of the United States, which provided factors to consider:

> [1] the desirability that the law furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; [2] the importance

---

[20] *Wellington Power Corp. v. CNA Sur. Corp.*, 217 W. Va. 33, 38, 614 S.E.2d 680, 685 (2005) (quoting *State v. Mem'l Gardens Dev. Corp.*, 143 W. Va. 182, 191, 101 S.E.2d 425, 430 (1957)).

[21] *Adkins v. Francis Hosp. of Charleston*, 149 W. Va. 705, 718, 143 S.E.2d 154, 162 (1965) (internal citation omitted).

7

of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and [3] the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments.[22]

In this instance, that nature of the certified questions from the district court highlights the ambiguous and unworkable standards that *Wellman* and *Tawney* created. The doctrine established by the cases is so unsound that courts cannot determine whether the cases remain binding precedent or, much less, apply novel concepts like the "method of calculating" requirement. And, here again, this Court refuses to answer the certified question about what the unprecedented term of art means. Instead, the majority further convolutes the doctrine by punting the question as if answering it may accidentally allow lessees to contract away *Wellman*'s baseless default rule.

With such unclear and unfounded standards, it is impossible for lessees and lessors to confidently plan their affairs, which leads to unneeded litigation. For example, the parties to this case agreed that the lessee would pay the lessor royalties based on the sale price "less any charges for transportation, dehydration, and compression paid by the [the lessee] to deliver the oil, gas, and/or coalbed methane gas marketed . . . ." In any other

---

[22] *Meadows v. Meadows*, 196 W. Va. 56, 64, 468 S.E.2d 309, 317 (1996) (quoting *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 403 (1970)).

8

context, there would be little room to dispute the unambiguous contract terms: the lessee pays the lessor royalties based on the proceeds minus the listed expenses. But under *Wellman* and *Tawney*'s novel standard, a dispute exists as to whether the express contract terms crack *Tawney*'s undefined code to negate an implied covenant. We could remove all confusion by wiping the slate clean of *Wellman* and *Tawney* and allowing parties to govern their own affairs—as we do in other commercial relationships. We do not need to protect parties from their own contracts.

        For these reasons, I respectfully dissent.

9