No. 23-522, *Francis Kaess v. BB Land, LLC*

**FILED**

**June 6, 2025**

**released at 3:00 p.m.**
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Walker, Justice, dissenting, and joined by Justice Bunn:

In this certified question proceeding, the majority opinion applies an implied duty to market to an oil and gas lease that contains an in-kind royalty provision. It goes on to hold that the requirements for the deductions of post-production expenses from *Wellman*[1] and *Tawney*[2] apply to the lease. With respect for my colleagues in the majority, I dissent. As explained below, the majority's analysis does not withstand scrutiny primarily because it muddles the distinction between different types of leases. As a result, the majority effectively rewrites the leases to take money from the producers to give it to the royalty owners. But it is not the province of this Court to rewrite an oil and gas lease to

---

[1] *See* Syl. Pt. 4, *Wellman v. Energy Res., Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001) ("If an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale.").

[2] *See* Syl. Pt. 10, *Estate of Tawney v. Columbia Natural Res.*, 219 W. Va. 266, 633 S.E.2d 22 (2006) ("Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs.").

1

reflect the Court's view of a fair bargain. We certainly would not go to such extreme measures to rewrite contracts in any other context.[3]

I would have held that for leases that contain an in-kind royalty provision, there is no implied duty to market arising from the lease/contract and the requirements of *Wellman* and *Tawney* for the deductions of post-production expenses are inapplicable. As explained below, an implied duty to market is only triggered when a royalty owner does not or cannot take physical possession of its royalty share of the production; when that occurs, the producer must market and sell the royalty owner's share of the production to avoid waste and loss, and the producer may properly charge the royalty owner his share of any post-production costs.

One of the most contentious legal issues in the oil and gas industry is the dispute concerning the deductibility of post-production costs from royalty payments owed to lessors.[4] At the risk of oversimplification, most royalty clauses generally fall into one

---

[3] When examining a contract in an employment dispute, this Court stated that: "Our task is not to rewrite the terms of contract between the parties; instead, we are to enforce it as written." *Fraternal Ord. of Police, Lodge No. 69 v. City of Fairmont*, 196 W. Va. 97, 101, 468 S.E.2d 712, 716 (1996). In the same way, we have held parties to a contract dispute involving an insurance policy to the plain language in the policy and noted that: "'We will not rewrite the terms of the policy; instead, we enforce it as written.'" *Auto Club Prop. Cas. Ins. Co. v. Moser*, 246 W. Va. 493, 500, 874 S.E.2d 295, 302 (2022) (quoting *Payne v. Weston*, 195 W. Va. 502, 507, 466 S.E.2d 161, 166 (1995)).

[4] *See* William T. Silvia, *Slouching Toward Babel: Oklahoma's First Marketable Product Problem*, 49 Tulsa L. Rev. 583 (Winter, 2013) (outlining the "minefield of judicial interpretations among the major oil and gas-bearing states[,]" including West Virginia);

of two broad categories: "proceeds" royalty provisions, which provide for the mineral owner to receive a royalty consisting of a monetary share of the proceeds the producer receives from the sale of the oil and gas produced under the lease, and "in-kind" royalty provisions, which provide for the mineral owner to receive a royalty consisting of a portion of the *physical* oil and gas produced, tendered at the wellhead.

This Court has stated that an oil and gas lease is both a conveyance and a contract because it contains "traditional conveyancing portions and the usually separate contractual portions."[5] The contractual portions of an oil and gas lease govern the rights and responsibilities of the parties.[6]

The majority begins on the wrong foot when it states that "this Court is 'once again asked to wade into the waters of postproduction costs[,]' an expedition that by

---

Scott Lansdown, *The Marketable Condition Rule*, 44 S. Tex. L. Rev. 667, 668-69 (2003) (recognizing the deductibility of post-production costs is a widely litigated issue in the oil and gas industry).

[5] *McCullough Oil, Inc. v. Rezek*, 176 W. Va. 638, 642, 346 S.E.2d 788, 792-93 (1986); *see also Teller v. McCoy*, 162 W. Va. 367, 383, 253 S.E.2d 114, 124 (1978) ("The authorities agree today that the modern lease is both a conveyance and a contract.").

[6] *Ascent Res. - Marcellus, LLC v. Huffman*, 244 W. Va. 119, 125, 851 S.E.2d 782, 788 (2020); *see also* Phillip T. Glyptis, *Viability of Arbitration Clauses in West Virginia Oil and Gas Leases: It Is All About the Lease!!!*, 115 W. Va. L. Rev. 1005, 1007 (2013) ("[A] lease is by definition a contract. All rights and protections are controlled by the principles of contract law and depend on the proper construction.").

3

necessity begins with a review of our relevant precedents."[7]   But the cause of action that prompted the certified questions is Mr. Kaess's claim that BB Land breached their contract by improperly deducting post-production costs from his royalties.  A breach of contract analysis in *any* context should not begin with industry-specific precedent, but with the language of the contract itself.  In failing to observe that very basic starting point, what the parties *actually agreed to* is dwarfed into insignificance at the outset.

When the oil and gas lease is not ambiguous and plainly expresses the intent of the parties, then it must be enforced according to that intent.  This Court has held that: "An oil and gas lease which is clear in its provisions and free from ambiguity, either latent or patent, should be considered on the basis of its express provisions and is not subject to a practical construction by the parties."[8]  As we said in Syllabus Points 1 and 3 of *Cotiga Development Company v. United Fuel Gas Company*,[9]

> [a] valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent.
>
> It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as

---

[7] Quoting *SWN Prod. Co., LLC v. Kellam*, 247 W. Va. 78, 84, 875 S.E.2d 216, 222 (2022).

[8] Syl. Pt. 3, *Little Coal Land Co. v. Owens-Illinois Glass Co.*, 135 W. Va. 277, 63 S.E.2d 528 (1951).

[9] 147 W. Va. 484, 128 S.E.2d 626 (1962).

4

expressed in unambiguous language in their written contract or to make a new or different contract for them.

Under an oil and gas lease that contains an in-kind royalty clause, the lessor owns a share of the actual production at the wellhead. "Where the royalty owner has the necessary infrastructure to take physical possession of its royalty share of the production, a lessee may discharge its royalty obligations under an in-kind royalty clause by delivering the royalty owner's share of the production directly to the royalty owner."[10] But if the royalty owner decides to monetize its royalty, "it may make its own arrangements—on its own terms and at its own risk—to sell its share of the production to a third-party purchaser."[11] For these reasons, the implied duty to market does not apply to an in-kind royalty provision lease and the majority should have answered the first certified question in the negative.

Obviously, not all royalty owners have the infrastructure (wells or tanks or pipelines) to store and market their one-eighth share of the oil and gas produced. But the majority wrongly concludes that Mr. Kaess's alleged inability to take his share of the oil and gas produced creates an inherent ambiguity in an otherwise straightforward in-kind

---

[10] Byron C. Keeling, *Fundamentals of Oil and Gas Royalty Calculation*, 54 St. Mary's L.J. 705, 711 (2023) (footnotes omitted).

[11] *Id*.

lease.[12]  As commentator Byron C. Keeling has described, when Mr. Kaess could not take his one-eighth share of the oil and gas in kind, BB Land had three possible courses of action:

> If, for whatever reason, a royalty owner does not or cannot take physical possession of its royalty share of the production under an in-kind royalty clause, then the lessee or producer may discharge its royalty obligation to the royalty owner in one of several ways:
>
> (1) The producer may deliver the royalty owner's share of the production to a pipeline purchaser or other third-party purchaser near the wellhead—free of cost, and to the royalty owner's credit—under the terms of a division order or other contract in which the purchaser pays the royalty owner directly for its share of the production.
>
> (2) The producer may buy the royalty owner's share of the production from the royalty owner on terms that the producer negotiates with the royalty owner.
>
> (3) Or, if the producer does not either buy the royalty owner's share of the production or deliver the royalty owner's share of the production to a purchaser free of cost, then under the implied marketing covenant, the producer must market and sell the royalty owner's share of the production—on the royalty owners behalf—along with the producer's own share of the production.[13]

Under this commentator's scenario three, an implied duty to market is triggered—to avoid waste and loss—when the producer does not either buy the royalty

_____

[12] Because there is no evidence in the record regarding Mr. Kaess's infrastructure (or lack of infrastructure), this is not a proper ground for finding an ambiguity.

[13] *Id.* at 711-12.

owner's share of the production or deliver it to a purchaser free of cost. The majority cites

that portion of Mr. Keeling's article. But the majority omits the very next paragraph of the

article, which states that the producer *may* properly charge the royalty owner his share of

any post-production costs in this scenario:

> If, under the third of these options, the producer sells the royalty owner's share of the oil and gas production, the producer must pay the royalty owner the net proceeds that the producer received for the royalty owner's share of the production—or, in other words, the producer must pay the royalty owner its share of the actual sales price for the oil and gas production, minus the royalty owner's share of the costs that the producer incurred to make the production marketable and deliver it to the downstream point of sale. Because any such sale arises from the implied marketing covenant, the producer must market the production in a way that mutually benefits both the producer and the royalty owner—typically by selling the production for the "best price . . . reasonably available." *Nonetheless, the producer may properly charge the royalty owner with the royalty owner's share of any post-production costs on the theory that those post-production costs enhance the value of the production for the mutual benefit of both the producer and the royalty owner.*[14]

Turning to the second certified question—whether the requirements for the

deductions of postproduction expenses from *Wellman* and *Tawney* apply to leases

containing an in-kind royalty provision—it is unnecessary for me to give an exhaustive

overview of our caselaw because the majority has done so. It is sufficient to recognize that

in the landmark ruling of *Wellman*, this Court examined a *proceeds* royalty lease that was

---

[14] *Id*. at 711-12 (footnotes omitted and emphasis added).

silent on what party would bear post-production costs.[15]  In *Wellman*, we established the presumption that unless the lease provides otherwise, the lessee bears post-production costs, and when we articulated that presumption, we referred specifically to "proceeds" leases.[16]  In *Tawney*, this Court expanded on *Wellman* by clarifying the type of language that must be included in a lease that contains a proceeds royalty clause before a lessor could allocate some, or all, of the post-production expenses to the lessor.[17]

As explained above, the contract dispute before the district court in this case—unlike *Wellman* and *Tawney*—involves a lease that contains an *in-kind* royalty provision.[18]  For this reason, the requirements for the deductions of postproduction expenses from *Wellman* and *Tawney* do not apply here and the majority should have answered the second certified question in the negative.

By proclaiming that that *Wellman* and *Tawney* apply to *all* oil and gas leases in West Virginia, the majority has lost sight of the fact that the language of the in-kind royalty lease controls.  Words in the contract matter; when the terms are clear there is no

---

[15] 210 W. Va. at 211, 557 S.E.2d at 265.

[16] *See* note 1.

[17] *See* note 2.

[18] As the majority notes, the district court held that by virtue of Mr. Kaess's failure to respond to a request for admission, the court deemed admitted "that the LEASE entitles YOU to receive YOUR royalty in-kind, as opposed to a percentage of proceeds received by [BB LAND] from the sale of any OIL, GAS, or NGLs."

reason to resort to an implied covenant. This principle of law applies to oil and gas leases just like any other contract. The terms of the lease, including its royalty clause, are freely negotiable.[19] So, the parties to an oil and gas lease may, if they wish, agree to shift some of the costs of production to the lessor in exchange for an increase in the royalty interest that he is entitled to receive on production.[20]

The majority goes further off course when it devotes pages to its fascination with *Leggett's*[21] criticism of *Wellman* and *Tawney*—as well as *Kellam's*[22] criticism of *Leggett*—along with the legislative history of West Virginia Code § 22-6-8 (a statute that deals with flat-rate leases[23]). This discussion offers nothing useful to the questions presented. And this walk down memory lane reveals the majority's motive for engaging in this endeavor when it grasps ahold of this controversy to declare, by judicial fiat, that "the Legislature's extension of *Wellman* and *Tawney* to leases containing flat-rate royalty provisions [is] a persuasive indicator that those precedents should govern leases containing

---

[19] *See* Jeff King, *Natural Gas Royalties: Lessors vs. Lessee and the Implied Covenant to Market*, 63 Tex. Bar J. 854 (2000) ("Oil and gas leases are negotiated contracts.").

[20] *Id.* ("As to the royalty amount, the parties to the lease are free to decide and define the type, basis, or standard for the royalties to be paid.") (citations omitted).

[21] *Leggett v. EQT Prod. Co.*, 239 W. Va. 264, 800 S.E.2d 850 (2017).

[22] *SWN Prod. Co., LLC v. Kellam*, 247 W. Va. 78, 875 S.E.2d 216 (2022).

[23] Flat-rate leases require the producer to pay the royalty owner a set royalty per well, per year, whether that well produces oil and gas or not.

in-kind royalty provisions as well." Indeed, the majority "discern[s] no principled basis on which to hold that in-kind leases are somehow different[,]" to flat-rate leases. But if the Legislature intended West Virginia Code § 22-6-8's protections to include freely negotiated in-kind royalty provision leases, it certainly would have said so.

The majority's sweeping holding is audacious—a three-member majority has now commandeered leases across the State for judicial revision—and its damaging impact on this institution's legitimacy will be felt for years to come. Its decision cannot be justified by the parties' written agreement. It cannot be justified by our case law. Nor is there any authority for extending the Legislature's statutory protections for royalty owners who hold flat-rate leases to those who hold in-kind royalty leases. Because I find no authority for the invasion into the right to contract that the majority now commits, I dissent. I am authorized to state that Justice Bunn joins in this dissent.

10