577 S.E.2d 258

Isabel J. BRYAN, Plaintiff
below, Appellant,

v.

BIG TWO MILE GAS COMPANY, a
West Virginia corporation, De-
fendant below, Appellee.

No. 29641.

Supreme Court of Appeals of
West Virginia.

Submitted Oct. 23, 2001.

Decided Dec. 11, 2001.

Dissenting Opinion of Justice
Starcher Jan. 8, 2002.

Ancil G. Ramey, Esq., Steptoe & Johnson, Charleston, for Appellant.

John F. McCuskey, Esq., Christopher J. Sears, Esq., Shuman, McCuskey & Slicer, PLLC, Charleston, for Amici, Independent Oil & Gas Association of West Virginia; R. Thomas Hansen, President, Sigma Corporation; Denny Harton, President, Gassearch Corp.; Richard E. Heffelfinger, Vice President, Rubin Resources, Inc.; Lloyd G. Jackson, President, Lloyd Jackson Well Service, Inc.; Stanley N. Masoner, President, Petroleum Resources, Inc.; C.E. Richner, CEO, C.E. Richner; John J. White, President, R.H. Adkins Companies; and R. Dennis Xander, President, Denex Petroleum Corporation.

J. Thomas Lane, Esq., Michael J. Halaiko, Esq., Kenneth E. Webb, Jr., Esq., Bowles, Rice, McDavid, Graff & Love, Charleston, for Appellee.

STARCHER, J.

In the instant case we rule that an oil and gas company whose lease terminated due to an unexcused cessation of production must pay to the property owner the value of the gas that was produced after the lease termination, less a portion of the reasonable costs of production.

## I.

### Facts & Background

The appellant is Isabel J. Bryan ("Mrs. Bryan"); the appellee is Big Two Mile Gas

Company ("BTM"). In 1935, BTM's predecessor-in-title entered into an oil and gas lease with Mrs. Bryan's predecessor-in-title. The lease contained a "thereafter" clause that provided that the lease would last "for the [primary] term of one (1) year" and "as long thereafter as oil or gas, or either of them is produced." The lease also provided for a royalty to the lessor of 1 cent for every thousand cubic feet of gas produced from the well. During the 1–year primary term of the lease, a well was drilled, gas production began, and royalty payments began. Continuous gas production from the well apparently continued thereafter until the period of time at issue in the instant case.

In early 1987, BTM lost its contract with the customer that had been purchasing gas from the well. BTM ceased gas production and royalty payments. In November of 1988, Mrs. Bryan's husband died. As executrix of his estate, Mrs. Bryan contacted BTM in 1989, advising BTM that she believed that BTM's non-production of gas had terminated its right to operate the well. BTM replied in a letter stating that BTM still had the right to operate the well, and that BTM was hopeful that renewed production would begin when BTM obtained a new customer for the gas from the well.

In December of 1991, Mrs. Bryan had an attorney write to BTM, again asserting that non-production had terminated BTM's rights to the well. BTM replied to this letter by stating that BTM had (without advising Mrs. Bryan) resumed production in December of 1990. BTM sent Mrs. Bryan a royalty check for gas that had been produced since production resumed. Mrs. Bryan refused the check and she filed suit against BTM in 1993, asserting *inter alia* that BTM had lost its right to operate the well because of BTM's cessation of production.[1]

During the discovery phase of the litigation, Mrs. Bryan inspected BTM's production records. These records showed that no gas production was metered from the well from November of 1979 to April of 1980 (although BTM claimed at trial that there had been gas production during this period that was not recorded because of a defective meter).

At trial, Mrs. Bryan claimed that the (disputed) cessation of production in 1979–80, as well as the undisputed cessation of production in 1987–90, had terminated BTM's leasehold rights to produce and sell gas from the well.

The circuit court, with the agreement of the parties, decided to separate the case into a liability phase, and if necessary, a damages phase. The issue in the liability phase was whether cessation of production by BTM in 1979–80 and/or 1987–90 had terminated BTM's leasehold rights.

The jury found for Mrs. Bryan with respect to both periods of time. The circuit court then entered an order under Rule 54(b) of the *West Virginia Rules of Civil Procedure*,[2] entering final judgment on the jury's verdict and certifying that order as immediately appealable. BTM filed a petition for appeal; however, this Court voted not to accept the petition.

After we refused to hear BTM's petition for appeal on the liability issues, the circuit court determined that as a matter of law Mrs. Bryan was entitled to a "reasonable royalty" on gas produced from the well after

1. Mrs. Bryan also claimed in her lawsuit that the 1 cent/MCF royalty was unconscionably low; she did not pursue this claim at trial. The customary modern royalty for oil and gas leases is 1/8, or 12.5 percent; based on the price BTM was receiving from sales from the well in the 1980s, the briefs indicate that the 1 cent/MCF figure worked out to be about a 1.4 percent royalty.

2. Judgment Upon Multiple Claims or Involving Multiple Parties. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

the 1979–80 cessation of production, and that a one-eighth royalty was a reasonable royalty. The trial court, sitting without a jury, computed the royalty based on the undisputed facts regarding production and entered judgment accordingly.

Mrs. Bryan has appealed this judgment; she contends that the trial judge used the wrong measure of damages. Specifically, she claims that she is entitled to the actual value of the gas taken and sold from the well after 1979, without any deduction for costs of production. She also raises other issues challenging the trial judge's rulings relating to her monetary recovery, that we discuss *infra* at III.C. BTM defends the trial judge's approach to damages as being correct. Additionally, BTM has cross-appealed the jury's liability determination as not being supported by the evidence.

## II.

### *Standard of Review*

■ We review jury determinations (assuming that the jury was properly instructed, of course) under a highly deferential standard. We review a trial judge's strictly legal rulings on the proper measure of damages *de novo*.

## III.

### *Discussion*

### A.

### *Liability*

The first issue that we address is the cross-appeal by BTM of the jury's determination that BTM's lease terminated due to non-production in 1979–80.

Mrs. Bryan argues that BTM is barred from raising this issue by the doctrine of *res judicata*, because this Court voted not to accept and hear BTM's petition for appeal of the circuit court's partial judgment on liability.

■ However, Mrs. Bryan's argument on this point runs directly counter to the principle that "an appellate court ought to usually have before it all of the controversy that was brought to the court below." *Riffe v. Armstrong*, 197 W.Va. 626, 637, 477 S.E.2d 535, 546 (1996), *modified on other grounds by Moats v. Preston County Commission*, 206 W.Va. 8, 521 S.E.2d 180 (1999). We stated in *Riffe* that in the case of partial judgments, even though they are certified by a trial court as immediately appealable under Rule 54(b), this Court may "elect to defer consideration of [an] appeal until an appeal is taken from the order terminating the entire action." Syllabus Point 3 (in part), *Riffe, supra*.[3]

■ We hold therefore that when a party has petitioned for appeal of a circuit court's partial judgment entered pursuant to *West Virginia Rules of Civil Procedure*, Rule 54(b) or otherwise, and this Court does not accept the petition, the petitioner is not barred by *res judicata* from raising the errors that were asserted in the refused petition for appeal of the partial judgment in a

---

**3.** While "polyfurcation" (*See State ex rel. Crafton v. Burnside*, 207 W.Va. 74, 79 n. 5, 528 S.E.2d 768, 773 n. 5 (2000)) of the issues in a civil trial may present a superficial appeal in a given case, the longstanding experience of our courts is that unitary liability and damages proceedings are in most cases both more fair and more efficient; and therefore, a preference for unitary proceedings is recognized as a core principle of Anglo–American jurisprudence. (Mass litigation, where the presence of common issues in a large number of related individual cases dictates otherwise, is a well-recognized exception to this general rule. *Id.*) As Justice Cleckley stated, concurring in *State ex rel. Cavender v. McCarty*, 198 W.Va. 226, 233, 479 S.E.2d 887, 894 (1996):

The point that I underscore is that the decision to separate the trial of liability from damages is important, affecting more than convenience; "it makes a substantial change in the nature of the jury trial itself." It is for this reason that the bifurcation decision goes beyond the pale of mere trial management.... We believe as a policy matter that ... that separation of this kind should be sparingly used. [citations omitted.]

We held in Syllabus Point 4 of *Sheetz, Inc. v. Bowles, Rice, McDavid, Graff & Love, PLLC*, 209 W.Va. 318, 547 S.E.2d 256 (2001):

West Virginia jurisprudence favors the consideration, in a unitary trial, of all claims regarding liability and damages arising out of the same transaction, occurrence or nucleus of operative facts, and the joinder in such trial of all parties who may be responsible for the relief that is sought in the litigation.

subsequent petition for appeal arising out of the same action.

Turning to the substance of BTM's cross-appeal, BTM argues that there was not sufficient evidence for the jury to determine that BTM had ceased production in 1979–80; or to determine that any cessation of production by BTM in 1979–80 or 1987–90 was not excusable, under the "temporary cessation of production" doctrine.

■ Our law is well-settled that a lease of the type that BTM had with Mrs. Bryan automatically terminates when there is a cessation of mineral production, unless the cessation of production is excused under the "temporary cessation of production doctrine." We stated in Syllabus Points 1, 2, 3, and 4 of *McCullough Oil, Inc. v. Rezek*, 176 W.Va. 638, 346 S.E.2d 788 (1986):

1. An oil and gas lease (or other mineral lease) is both a conveyance and a contract. It is designed to accomplish the main purpose of the owner of the land and of the lessee (or its assignee) as operator of the oil and gas interests: securing production of oil or gas or both in paying quantities, quickly and for as long as production in paying quantities is obtainable.

2. A habendum clause in an oil and gas lease (or other mineral lease) providing for a short primary term and a secondary term for "so long as" production in paying quantities or operations therefor continue, or similar language, conveys a "determinable" interest, that is, an interest subject to a special limitation. Such an interest automatically terminates by its own terms upon the occurrence of the stated event, namely, expiration of the primary term without production or operations at such time, or the cessation of production or operations during the secondary term.

3. Where an oil and gas lease (or other mineral lease) contains a cessation of production clause applicable to the secondary term, the lease terminates automatically at the end of the "grace period" provided by such clause, unless production or operations are resumed within the grace period. The cessation of production clause grants the lessee the right to resume operations within the grace period; it does not impose the duty to do so.[4]

4. The lessee (or its assignee as operator) is not entitled to notice before the lease terminates automatically under the habendum clause or the cessation of production clause of an oil and gas lease (or other mineral lease).

We explained the "temporary cessation of production doctrine" in *McCullough* as follows:

In the absence of a cessation of production clause, the courts in virtually all jurisdictions addressing the issue have developed a "temporary" cessation of production doctrine, whereby a mere "temporary" cessation of production during the secondary term for equipment repairs or technical problems, reworking operations, lack of a market, etc., does not result in an automatic termination of the lease, as these types of delays are normally not protracted and are incidental to the normal operation of the lease; they must, therefore, have been contemplated by the parties to be excusable. Factors to be considered in deciding whether a cessation of production is "temporary" include the length of time without production, the cause of the delay and whether the lessee exercised reasonable diligence to resume production.

*McCullough*, 176 W.Va. at 643–644 n. 5, 346 S.E.2d at 794 n. 5.[5]

The "temporary cessation of production doctrine" grows out of the recognition that, from a realistic and practical point of view, it is impossible for a lessee to operate a mineral lease continuously without any interruption whatsoever. Interruptions in production are necessary to perform maintenance operations, to repair or replace equipment, or to

4. There was no "grace period" in BTM's lease.

5. Additionally, we have stated:
Noncompliance with the letter of the extension clause of a lease of the kind now under consideration is excusable on the theory of compliance with its spirit and purpose *only when a high degree of diligence has been exercised by the lessee....*
*Anderson v. Schaffner*, 90 W.Va. 225, 229, 110 S.E. 566, 567 (1922) (emphasis added).

deal with the unanticipated loss of a market, etc. It would be draconian and impractical, for example,—and this Court believes, beyond the objectively reasonable contemplation of the parties to such a lease—to hold that the secondary term of a "thereafter and so long as" mineral lease terminates at the very moment production ceases, even for a few minutes, without allowing reasonable time for maintenance, repair, replacement of equipment, or obtaining a replacement for an unexpectedly lost market.

■ On the other hand, a lessee under such a lease has a continuing affirmative duty to produce and sell minerals—and a lessee cannot convert a need for occasional temporary cessation of production into a blanket excuse for failing to zealously perform that duty to produce and sell.

■ Accordingly, in line with what many other jurisdictions have done, see McCullough, supra, 176 W.Va. at 643–644 n. 5, 346 S.E.2d at 794 n. 5, this Court has adopted the "temporary cessation of production doctrine." The essence of this doctrine is that where a temporary cessation in production is genuinely necessary to accomplish necessary maintenance, repairs, or replacements, or to deal with the unexpected temporary loss of a market, the cessation is excusable and will not result in the termination of a mineral lease, so long as the lessee is diligent in accomplishing the maintenance, repairs, replacements, or marketing.

The practical application of this doctrine obviously requires fact-finding, involving whether the temporary cessation of production was actually caused by some problem involving the operation of the lease; whether the length of the cessation was reasonable; and whether the lessee diligently addressed the problem occasioning the temporary cessation of production. Such fact-finding is ordinarily a question for a jury or for the court if it is trying a case without a jury.

■ Based on the foregoing reasoning, we hold that a mere temporary cessation of production during the secondary term of a mineral lease that requires production to keep the lease in effect—for equipment repairs, technical problems, reworking operations, unexpected loss of a market, etc.—does not result in the automatic termination of the lease if the cessation can be characterized as excusable under the "temporary cessation of production doctrine." A temporary cessation of production is excusable if the period of cessation is not unreasonably protracted; if the reason for the period of cessation is incidental to the normal operation of the lease; and if it can be said that the possibility of such a period of cessation would be contemplated by objectively reasonable parties to such a lease. Factors to be considered in deciding whether a period of cessation of production is excusable include the length of time without production, the reason for the period of cessation, and whether the lessee exercised reasonable diligence to resume production, bearing in mind the continuing affirmative duty of the lessee under such a lease to produce and market minerals to keep the lease in effect. Whether a period of cessation of production is excusable under the foregoing standards and thus does not result in the automatic termination of a lease is ordinarily a question for the jury or other finder of fact.

BTM does not claim in the instant appeal that in the liability phase of the trial the jury was improperly instructed with regard to the temporary cessation of production doctrine; and in fact, the jury was instructed in a fashion that was consistent with the foregoing principles. BTM does claim, however, that the jury did not have enough evidence to find that BTM in fact ceased production in 1979–80; and BTM also claims that the jury did not have enough evidence to conclude that any period of cessation of production in 1979–80 or in 1987–90 was not excusable, under the foregoing standards.

■ We need not detail the substantial and conflicting evidence that was presented at trial on these issues. In summary, BTM's own meter records gave rise to a permissible inference of 4 to 5 months of non-production in 1979–80, and the nearly 3 years of non-production in 1987–90 was undisputed. There was substantial evidence from which the jury could find that BTM could have replaced any malfunctioning equipment in 1979–80 in a matter of days; and that in

1987–90 BTM could have pursued another market for gas in a much more timely fashion. The jury therefore clearly had a sufficient evidentiary basis to decide, for both periods of time, that BTM's lease had automatically terminated due to BTM's unexcused cessation of production.

We therefore find that BTM's cross-assignment of error as to the jury's liability determination is without merit.

## B.

### Damages

The second issue that we address is Mrs. Bryan's contention that the trial judge erred in ruling that, as a matter of law, Mrs. Bryan was only entitled to receive a "reasonable royalty" of 1/8 of the sale price received by BTM for gas produced from the well from BTM after 1979 (when the jury concluded that BTM's lease had terminated) as her measure of damages. The trial judge concluded that this was the proper measure of damages based on this Court's opinion in *Bethlehem Steel Corp. v. Shonk Land Company*, 169 W.Va. 310, 288 S.E.2d 139 (1982).

In *Shonk*, a landowner notified a coal company that was mining and processing coal on the landowner's property that the landowner considered the coal company to have forfeited its lease because of alleged noncompliance with various duties required by the lease. The coal company filed a declaratory judgment action to determine whether the lease was forfeited, and whether the lease could be renewed after its initial term expired. This Court stated in *Shonk* that the coal company "had held over its tenancy while this matter was in litigation." 169 W.Va. at 313, 288 S.E.2d at 141.

This Court decided in *Shonk* that the lower court had erred in finding a forfeiture of the lease, because the landowner had known its rights under the lease but had stood by and not done anything to assert those rights. We did, however, uphold the right of the landowner not to renew the lease for another term. We discussed what measure of lease-type rental damages was applicable to the coal company as a holdover tenant for the period of time that the company continued in possession of the leased premises during the litigation.

As holdover tenant damages, the trial judge in *Shonk* ordered a separate rental payment by the coal company for rental of the surface of the land for coal processing operations, in addition to the payment of royalties for mineral production. We reversed the trial court on this issue, holding that the company's use of the surface was included in the royalty payments, stating: "Damages for wrongful holding over are measured by reasonable rental value. Reasonable rental value of a producing mineral lease is reasonable royalties." Syllabus Point 8, *Shonk, supra.*

In the instant case, the trial court concluded that BTM's conduct *vis-a-vis* Mrs. Bryan was "wrongful holding over"—and that the measure of damages to Mrs. Bryan was therefore the rental value of her property under a mineral lease, or a reasonable royalty.

A "holdover tenancy" is a tenancy or lease-type relationship that is created by legal implication under certain circumstances—generally, by the landowner's conduct. In 49 Am.Jur.2d *Landlord & Tenant* § 353, the general rule is stated to be that "a landlord has the option to treat a tenant wrongfully holding over as a trespasser, or to accept the holding over and treat him as a tenant. If the landlord elects to refuse to allow the tenant to remain, the tenant becomes a trespasser and may be ejected.... The election is strictly that of the landlord; a tenant holding over has no election to regard himself as a tenant."

In *Angel v. Black Band Consol. Coal Co.*, 96 W.Va. 47, 122 S.E. 274 (1924), we held that a former employee who remained in a house owned by his employer after his employment terminated was not a trespasser, but rather was a holdover tenant at will, because his employer knew he was on the premises and had treated him as such. However, we said that when the employer terminated the tenancy at will by giving notice, the former employee then became a trespasser.

Thus, a landowner's conduct—such as the election of a remedy, a demand for or conscious acceptance of payments, or acquiescence in the continued use of land—may dictate that the rights and remedies between the landowner and a party making use of the landowner's land after the termination of a lease should nevertheless continue to be governed by lease-type rights and responsibilities—*i.e.*, a "holdover tenancy."[6]

However, no such circumstances occurred in the instant case. Mrs. Bryan was not aware of BTM's conduct in 1979–80 that terminated BTM's lease—because BTM continued to send Mrs. Bryan royalty checks that were based on an "estimate" of production. And when Mrs. Bryan learned of BTM's 1987–90 non-production, she promptly and repeatedly told BTM that they no longer had the right to use her property; and she refused BTM's tendered royalty check when they advised her that they had resumed production.

When we stated in *McCullough* that "thereafter" leases automatically terminate upon cessation of production (except for excusable temporary cessations), we did not suggest that a leasehold relationship automatically started up again if the gas company simply started producing again. And nothing in *Shonk* suggests that a former lessee whose lease has terminated due to a breach of their duty to produce minerals is entitled as a matter of law and over the landowner's objection to simply pay the going royalty rate and resume production and sale of minerals that the former lessee no longer has a right to produce and sell.

In Syllabus Points 7 & 8 of *Pan Coal Co. v. Garland Pocahontas Coal Co.,* 125 S.E. 226, 97 W.Va. 368 (1924), we stated:

In an action for the value of coal wrongfully mined and removed from plaintiff's lands by a trespasser, the measure of damages depends upon whether the trespass was innocent or wilful [sic].

If the trespass be committed, not recklessly, but through inadvertence or mistake, or in good faith, under an honest belief that the trespasser was acting within his legal rights, it is an innocent trespass, and the measure of damages for the coal mined and carried away is the value of the coal in place, usually to be ascertained by finding its value at the pit-mouth or loading tipple, and deducting therefrom the expense of mining and carrying it to the pit mouth or tipple. But, if the trespass be wilful [sic], in an action for the value of the coal so mined, the measure of damages is its value at the pit mouth or loading tipple, without deduction for mining and carrying it to the place of conversion.

BTM claims that because it once had a valid lease with Mrs. Bryan, it is entitled to be assessed a more forgiving measure of damages than would be applied to an innocent mineral trespasser that never had leasehold rights. But situations can be readily imagined wherein a mineral remover who never had a lease would be properly seen as less culpable for accidentally removing minerals that they did not have a right to remove, than a former lessee who continued to remove minerals after their own conduct had breached and terminated their right to do so. Accordingly, we cannot approve as a rule of law the measure of damages that the trial court used—a measure that would give to a former lessee a more lenient measure of damages than the measure that is applied to

6. Whether the coal company was properly to be treated as a holdover tenant on the leased premises was not a disputed issue that was addressed in the opinion in *Shonk*. The use of a "holdover tenancy" measure of damages where an oil and gas lease terminated for non-production was rejected in a recent Texas case, *Natural Gas Pipeline Company of America, et al. v. Pool*, 30 S.W.3d 618 (2000). In another case, that looked to *Shonk* for guidance on West Virginia law, *Imperial Colliery Co. v. Oxy USA*, 912 F.2d 696 (4th Cir.1990), followed by *Imperial Colliery Co.*

*v. Cities Service Oil and Gas Corp.*, 998 F.2d 1009, 1993 WL 241589 (4th Cir.1993), the court held that the lessee remained a holdover tenant, and limited oil and gas removal damages to reasonable royalties, after a lease had terminated for non-production. To the extent that *Imperial Colliery* read our *Shonk* opinion as holding that reasonable royalties are in all cases the proper measure of mineral removal damages when a mineral lease terminates due to cessation of production, such a reading was erroneous.

other persons who remove minerals without having the right to do so.[7]

Based on the foregoing, we held that where a mineral lease has automatically terminated due to an unexcused period of cessation of production by the lessee, and mineral production is subsequently resumed by the former lessee without the informed and knowing agreement by the mineral owner to a renewal of the lease and the resumption of production, the former lessee is a trespasser with regard to mineral production subsequent to the lease's termination, and the mineral owner may recover in damages from the former lessee the actual value of the minerals removed after the lease's termination with no deduction for the cost of producing unless the former lessee shows that the renewal of production was the result of innocent conduct on his part. The issues of the mineral owner's agreement to the renewal of the lease and the resumption of production, and the innocence of the former lessee, are ordinarily questions for the jury or other finder of fact.[8]

The foregoing holding can be applied to the facts of the instant case. There were no grounds established for reviving or recognizing leasehold-type rights for BTM after its lease terminated. There was no evidence that Mrs. Bryan approved and assented in a knowing and informed manner to a renewal of a leasehold relationship or to BTM's renewal of production after the lease's automatic termination due to BTM's unexcused cessation of production. BTM was a trespasser after their lease terminated.

On the issue of whether BTM was a willful or innocent trespasser, we recognize that this would ordinarily be a jury issue and intermingled with liability determination. But in the unusual posture of this case, where liability has already been determined after an extensive trial by a jury that is long gone, a jury determination on this issue would be highly impractical. We have concluded, then, upon reviewing the record, that in the particular facts of this case, the record would not support a finding that BTM's conduct was willful in connection with the 1979–80 cessation; however, the record is clear that as a matter of law that it was willful in connection with the 1987–90 cessation.[9]

Therefore, the proper measure of Mrs. Bryan's damages associated with the 1979–80 cessation is the value of the gas taken from the well and sold by BTM after the lease terminated in 1979, less the actual cost of production. The proper measure of damages associated with the 1987–90 cessation is the full value of the gas taken from the well without any deduction for costs of production.

We further conclude, again due to the unusual posture of this case and under the unique facts of this case, that such a calculation can and should be made by the trial court sitting without a jury. In making this calculation, we call the trial court's attention to our recent case of *Wellman v. Energy Resources*, 210 W.Va. 200, 557 S.E.2d 254 (2001). In that case we held that the "cost of [production] ... must [be] prove[d] by the producer] ... by evidence of the type nor-

---

7. In the instant case, the trial court's "reasonable royalty" measure of damages would in fact give Mrs. Bryan more money than she would have been entitled to receive if her lease with BTM had not terminated—because BTM's lease provided for a very low royalty. However, if BTM's lease with Mrs. Bryan had called for the customary modern one-eighth royalty, under the measure of damages used by the trial court BTM would pay no royalty penalty at all for the gas it took after its lease terminated.

8. We note that a landowner's ability to recover such trespass damages is obviously subject to all other applicable principles and doctrines of law, such as the statute of limitations, unjust enrichment, election of remedies, and estoppel.

9. In summary, our conclusion in this regard begins with the fact that BTM, as a professional lessee of oil and gas, knew that it had a duty of due diligence to produce gas and was at the least negligent in terms of complying with that duty. Then, BTM was on notice that Mrs. Bryan considered BTM's rights to be terminated, a position that we have found to be correct under the settled principles of law of *McCullough, supra*. BTM, which was at the least on constructive notice of the law, and which was on actual notice of Mrs. Bryan's objection, ignored both and produced gas in reckless disregard of both. This meets the willfulness criteria of *Pan Coal, supra*.

mally developed in legal proceedings requiring an accounting [and it must be proved that the producer] ... actually incurred such costs and that they were reasonable." Such a standard must be met in the instant case.

■ We also observe that the law's allowance of the reasonable costs of production in cases of innocent mineral trespass is not an invitation to or sanction of creative accounting. *Cf. Spruce River Coal Co. v. Valco Coal Co.*, 95 W.Va. 69, 120 S.E. 302 (1923). Consistent with *Wellman, supra*, we hold that the costs of production that may be deducted from the value of removed minerals in the case of an innocent mineral trespass that removes oil and gas via a well must be objectively reasonable operating costs that were actually incurred in the operation of the well in question and should be determined according to the principle that any reasonable doubt as to the proper nature and measure of such costs is to be resolved in favor of the mineral owner, as opposed to the trespasser.

## C.

### Other Issues

Mrs. Bryan also assigns as error the trial court's rulings with respect to her requests for special damages, unjust enrichment damages, treble damages, waste damages, punitive damages, attorney fees, and prejudgment interest. The damages methodology that we have required upon remand in large measure addresses many of the arguments and principles that underlie these requests, and we decline to disturb the trial court's rulings thereon.

## IV.

### Conclusion

The judgment of the circuit court is reversed, in part, and this case is remanded for further proceedings in conformance with this opinion.

Reversed in Part and Remanded.

Justice ALBRIGHT, deeming himself disqualified, did not participate in the decision in this case.

Judge JOHN S. HRKO, sitting by temporary assignment.

MAYNARD, Justice, dissenting.

I am concerned that the majority opinion will have an adverse effect on the oil and gas industry in West Virginia.

According to the *amici curiae* brief submitted on behalf of the Independent Oil & Gas Association of West Virginia, the oil and gas industry in West Virginia is responsible, directly and indirectly, for nearly 12,000 West Virginia jobs, 212 million dollars in personal incomes in the state, and 776 million dollars in total state output. In addition, during the 1996–97 fiscal year, more than 49 million dollars in tax collections were, in one way or another, attributable to the production of natural gas. I believe that the majority opinion unwittingly and unnecessarily does damage to the oil and gas industry, thus placing at risk the livelihoods of thousands of West Virginians as well as the substantial tax revenue generated by the industry.

The majority opinion errs on two fronts. First, although it pays lip service to the temporary cessation of production doctrine, it actually gives short shrift to it. Because of the high cost of exploring and drilling new wells, much of the investment in gas production in West Virginia is in the form of the purchase of existing gas wells. The duration of many of these wells is governed by "thereafter" clauses like the one in the instant case. Under the majority's application of the law, forfeiture can now result from the slightest cessation in production. This is unrealistic, impractical, and will have a chilling effect on the continued investment in the production of natural gas in this state. Given the significant investment required in the redrilling and reworking of older wells, no one will want to invest in a well that can be taken away with such ease.

Second, in assessing damages, the majority improperly treats Big Two Mile Gas Company as a trespasser or stranger to the land, when it was, in fact, a party to a contract for the lease of the land and had made substantial capital investments in improving that land. Under the facts of this case, I believe

that the continued payment of reasonable royalties was a fair measure of damages that placed both parties in the position they would have occupied had the lease never expired. Unfortunately, the majority applies a confiscatory rule which is bound to have a negative impact on the incentive to invest in gas wells in this state.

Accordingly, for the reasons stated above, I dissent.