

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| JTC OIL COMPANY, INC., ET AL., | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | WD82859 |
| | ) | |
| CITY OF GRANDVIEW, | ) | Opinion filed:  April 21, 2020 |
| | ) | |
| Respondent. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**THE HONORABLE S. MARGENE BURNETT, JUDGE**

Division Four:  Karen King Mitchell, Chief Judge,
Edward R. Ardini, Jr., Judge and Thomas N. Chapman, Judge

JTC Oil Company, Inc. ("JTC") and Jerry Kerr appeal the judgment of the Circuit Court of Jackson County granting summary judgment in favor of Respondent City of Grandview ("the City"). At issue in this action is whether the City's denial of JTC's application to install oil wells on land pursuant to JTC's oil and gas lease constituted inverse condemnation. The trial court granted the City's motion for summary judgment, finding that JTC's oil and gas lease had terminated prior to JTC filing its application with the City, and thus JTC and Jerry Kerr—successor lessor of the oil and gas lease—had no "valuable property right" that could be taken by the City. For the reasons stated below, we reverse and remand.

**Factual and Procedural Background[1]**

The oil and gas lease at issue in this case ("the Lease") was entered into in 1986 between Sunrise Dairy Farms ("Sunrise Dairy") and Kanzou Exploration, Inc. ("Kanzou"). Sunrise Dairy "granted, demised, leased, and let" to Kanzou the right to mine and produce oil and gas on Sunrise Dairy's property, which was located within the City's boundaries and which included the 120-acre tract relevant to this action. The duration of the Lease was described in the habendum clause as follows: "[T]his lease shall remain in force for a term of one years [sic] from this date, and as long thereafter as oil or gas, or either of them, is produced from the land by the lessee."[2] Three oil wells were drilled and a tank battery was installed on the 120-acre tract.

Subsequent to the creation of the Lease, the 120-acre tract was divided into nine parcels of land with eight owners. One of those owners was Appellant Jerry Kerr ("Kerr"). Kerr and Deanna Daniels (who Kerr later married) purchased 80 acres from Sunrise Dairy on January 20, 1988, subject to the Lease. By virtue of the purchase, Kerr was entitled to receive 40% of 3/16 royalty of oil produced on the land covered by the Lease. Kerr and Deanna[3] sold their property in November 2001, but reserved the oil and mineral rights underlying the surface estate and right to royalties under the Lease.

---

[1] The facts, and the reasonable inferences that can be drawn therefrom, are set forth in the light most favorable to JTC and Kerr, as they were the parties against whom summary judgment was entered. *See ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993).

[2] In an oil and gas lease, the purpose of a habendum clause, also known as the "term clause," "is to define and limit the duration of the lessee's estate." *McCullough Oil, Inc. v. Rezek*, 346 S.E.2d 788, 793 (W. Va. 1986). "The habendum clause of virtually all contemporary oil and gas leases provides for a relatively short 'primary' term, consisting of a fixed period of time of from a few months to five or ten years, at the end of which period there must be production . . . ; the habendum clause also provides that the lease may be preserved for an indefinite period of time beyond the expiration of the primary term 'as long thereafter' as oil or gas is produced in paying quantities[.]" *Id.*

[3] We refer to Deanna by her first name to avoid confusion; no disrespect or familiarity is intended. Deanna is not a party to this action and Kerr has asserted that she has never claimed any rights to "the minerals underlying the Subject Property or that may be produced therefrom."

In 2003, the City passed an ordinance requiring that oil producers obtain a conditional use permit in various zoning districts prior to drilling for oil.

On January 1, 2012, Kanzou assigned the Lease to T5 Leasing, LLC ("T5").

On December 27, 2012, the City rezoned the 120-acre tract as part of its Missouri 150 Corridor Plan, an addendum to its Comprehensive Plan. The northern portion of the tract was zoned "Planned District," which entailed mixed development including residential, office, and commercial use. The remaining acres were zoned "Agricultural District."

On March 6, 2013, JTC purchased the Lease from T5 for approximately $65,000. JTC made plans to drill additional oil wells on the property. It applied for and received approval from the Missouri Department of Natural Resources ("DNR") to drill 36 oil production wells on the 120-acre tract. JTC began drilling, but its efforts were halted by the City, which informed JTC that the City's approval was required before JTC could drill additional wells on the property.

In March of 2014, JTC filed an application with the City for a conditional use permit and conceptual development plan. JTC filed an amended application on February 18, 2015. The City's Planning Commission held a hearing on the application and voted to recommend the Board of Aldermen deny the application. A public hearing was held before the Board of Aldermen on May 12, 2015. The Board of Aldermen voted to deny JTC's application, and thereafter the City passed an ordinance approving the Board of Aldermen's decision.[4]

JTC appealed the City's decision by filing a petition with the trial court. In Counts I and II of its petition, JTC sought judicial review of the City's decision to deny its application for a

---

[4] The City denied JTC's application for the following reasons: JTC did not obtain consent to file the application from the eight fee property owners covered by the Lease; the proposed oil wells did not comply with the City's setback requirements, which included that all oil wells must be located at least 165 feet from any property line; JTC's application "propose[d] development in the area covered by the Lease that [did] not conform to the Comprehensive Plan, which calls for mixed use development (high density residential, office, and commercial)"; and because JTC's proposed development failed to satisfy all conditions required by Section 31-26(F)(4) and Section 31-19(E)(4) of the Zoning Ordinance.

3

conditional use permit and conceptual development plan. In Count III, JTC asserted a claim of inverse condemnation against the City. In Count IV, JTC sought a declaratory judgment that DNR's regulatory authority preempted local regulation of the activity requested by JTC, and that JTC had the legal right to proceed with oil well development under its state-approved permits.

The trial court bifurcated its consideration of the issues. JTC and the City submitted briefing regarding Counts I and II of the petition, and the trial court heard argument directed to those claims. On December 19, 2017, the trial court issued its judgment denying Counts I and II of JTC's petition, thereby affirming the City's decision to deny JTC's application. JTC has not appealed that determination.

In the fall of 2018, Kerr requested and was granted leave to intervene. Kerr thereafter filed a Complaint in Intervention, asserting a claim of inverse condemnation against the City. Kerr alleged that he was the "owner of certain property rights that entitled [Kerr] to royalties for oil produced from [the Lease]," the City's denial of JTC's conditional use permit and conceptual development plan denied Kerr "all rights to use of his royalty property," and the "[a]ctions of the City unreasonably and unlawfully restricted and destroyed the property right of [Kerr] to obtain the benefits of his lease."

The City filed a motion for summary judgment, asserting that JTC and Kerr had no compensable interest in the property at the time of the City's denial of JTC's application, thus their claims for inverse condemnation failed as a matter of law. The City pointed to the Lease's habendum clause—which provided that the Lease would continue "as long thereafter as oil . . . is produced from said land by the lessee"—and argued there were several periods when the lessee failed to produce oil for over one year. The City asserted those periods occurred prior to JTC's purchase of the Lease, and included:

4

- February 1988 through August 1989 (17 months)

- August 2001 through February 2003 (17 months)

- April 2003 through July 2004 (14 months)

- July 2006 through February 2008 (18 months)

The evidence provided by the City to support these periods of non-production consisted of records of the State Oil and Gas Council, which the City claimed reflected the Lease's monthly oil well production from 1987 through 2013.[5] The City contended that as a result of the periods of non-production, the Lease had terminated under its own terms prior to the Lease's transfer to JTC, and thus JTC "took ownership of nothing."

JTC and Kerr filed a joint motion for summary judgment and response to the City's motion.[6] In response to the City's motion, JTC and Kerr argued that (1) the City had no standing to challenge the Lease's validity because it was not a party to the Lease and (2) the Lease had not terminated for lack of production. Regarding the latter argument, JTC and Kerr contended that the State Oil and Gas Council records evidenced the amount of oil sold monthly, not the amount of oil produced. They asserted that these records actually reflected the wells were continuously producing oil. Alternatively, they argued that even if there were time periods when the wells were

---

[5] Section 259.010, RSMo, provides for the establishment of the State Oil and Gas Council, and section 259.070 sets forth its powers and duties. The State Oil and Gas Council, acting through DNR, has the authority to establish requirements regarding the filing of reports on oil well location, drilling and production, § 259.070.5(1)(b), and to "promulgate and to enforce rules, regulations, and orders," § 259.070.5(5). To that end, the State Oil and Gas Council has promulgated a rule which requires monthly reporting of oil well production to the State. *See* 10 CSR 50-2.080(2).

[6] JTC and Kerr sought summary judgment on the ground that the City's interpretation of its zoning ordinance, which required any oil wells be located more than 165 feet from property lines, effectively took from JTC its right to explore and produce oil under the Lease. JTC and Kerr asserted that as a result of the City's actions, the City accomplished a taking of their mineral interest without just compensation. Additionally, JTC "clarif[ied] that it [was] not seek[ing] relief under Count IV of the original petition," as "[t]he issue of preemption raised in that count was briefed by both sides and was determined as part of the determination of the permissibility of the City's actions." JTC advised that it was "not challenging the legality of the actions of the City – the question before the Court concern[ed] the consequences of those actions."

5

not producing oil, any temporary cessation of production did not automatically terminate the Lease.

After additional briefing by the parties, the trial court issued its final judgment granting the City's motion for summary judgment. The trial court found that "between the origination date of the lease in question, and the date that [JTC] purportedly acquired it, there were multiple periods of time exceeding a term of one year in which the land was not producing oil or gas" and that the Lease "was terminated at the first lapse in time of oil or gas production greater than a year, which . . . was the initial lapse between February 1988 through August 1989." As a result, the trial court determined that JTC had "no property interest in which to assert rights against Respondent City of Grandview." The trial court acknowledged JTC's argument that the State Oil and Gas Council records showed only lapses in oil sales, not cessation of oil production; however, the trial court found that JTC failed to produce "any evidence that any production occurred during the lapse periods[.]" The trial court's judgment did not specifically address Kerr's claim of inverse condemnation.

The following week, the trial court issued a corrected final judgment, which was identical in substance to the prior judgment except that it also addressed Kerr's inverse condemnation claim. Regarding Kerr's claim, the trial court found that "by this ruling, Intervenor's Complaint, being dependent upon the success of [JTC's] cause of action, is hereby dismissed with prejudice."

This appeal followed.

**Standard of Review**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Rule 74.04(c).

6

A defending party may establish a right to judgment by showing (1) facts that negate any one of the plaintiff's element facts; (2) that the plaintiff has been unable to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the plaintiff's elements; or (3) "that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly pleaded affirmative defense." *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 381 (Mo. banc 1993) (emphasis omitted). If the movant establishes a right to judgment, the burden shifts to the non-movant to demonstrate that the material facts shown by the movant are genuinely disputed. *Id.*

A genuine issue of material fact exists "where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts," and the dispute is "real, not merely argumentative, imaginary or frivolous." *Id.* at 382. In determining whether a genuine issue of material fact exists, we review "the record in the light most favorable to the party against whom judgment was entered" and "accord the non-movant the benefit of all reasonable inferences from the record." *Id.* at 376. "Summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Hill v. Ford Motor Co.*, 277 S.W.3d 659, 664 (Mo. banc 2009).

"The propriety of a grant of summary judgment is purely an issue of law which this Court reviews *de novo*." *Id.* "The criteria on appeal for testing the propriety of summary judgment are no different than those which should be employed by the trial court to determine the propriety of sustaining the motion initially." *Id.*

**Analysis**

JTC and Kerr raise three points on appeal. In Point I, they argue that the trial court erred in entering summary judgment in favor of the City "on the basis that the oil and gas lease at issue had

7

terminated at some period in the past because only a party to the lease may challenge the lease's validity" and the City, "a stranger to the lease, did not have standing to challenge its validity." In Point II, they assert that the trial court erred in entering summary judgment in favor of the City "on the basis that the oil and gas lease at issue had terminated at some period in the past because the Court's [sic] misinterpreted the terms of the lease, in that the Court conflated oil 'production' and oil 'sales' when interpreting the habendum clause of the lease." In Point III, they argue that the trial court erred in granting summary judgment in favor of the City because "the lease was still a valid lease and Kerr was entitled to damages pursuant to his mineral rights interest." We address each point in turn.

The City may challenge the Lease's validity

In their first point, JTC and Kerr argue that "the City has no legal standing to litigate whether the lease, now between Jerry Kerr, as successor to the lessor and JTC as successor to the lessee, is valid." We disagree.

JTC and Kerr brought claims of inverse condemnation against the City.[7] "To prevail on a claim for inverse condemnation, a landowner must plead and prove an invasion or appropriation of some valuable property right that directly and specially affects the landowner to his injury." *Scott Family Props., LP v. Mo. Highways & Transp. Comm'n*, 546 S.W.3d 605, 608 (Mo. App. E.D. 2018) (internal marks omitted) ("If Scott has no property right in the visibility of its building, then Scott also has no actionable injury resulting from the Commission's obstruction of that view."); *see also State ex rel. Chiavola v. Vill. of Oakwood*, 931 S.W.2d 819, 824 (Mo. App. W.D.

---

[7] Condemnation is the proceeding by which a governmental entity takes private property for public use; the entity initiates the proceeding, and just compensation for the taking is determined. *Metro. St. Louis Sewer Dist. v. City of Bellefontaine Neighbors*, 476 S.W.3d 913, 915-16 (Mo. banc 2016). "At times a public entity does not initiate condemnation proceedings but nonetheless intentionally or accidently takes private property," and "[i]n such cases, property owners may pursue claims for 'inverse condemnation.'" *Id*. at 916.

1996) ("The landowner does not have to show a physical taking but an invasion or appropriation of a valuable property right that caused an injury."). Thus, to prevail on their claims of inverse condemnation, JTC and Kerr must prove that they had a valuable property right which was taken by the City.

It was permissible for the City to challenge the "valuable property right" element of JTC's and Kerr's claims by showing that the Lease had terminated, and therefore they possessed no property right which the City could take.[8] *See ITT Commercial Fin. Corp.*, 854 S.W.2d at 381 (a defending party may establish a right to summary judgment by showing facts that negate any one of the plaintiff's elements facts). Although JTC and Kerr assert that the City was unable to do so as a stranger to the Lease, they fail to cite a single Missouri case that stands for the proposition that the City must be a party to the Lease in order to challenge its validity as a defense to an inverse condemnation claim. Rather, JTC and Kerr rely on cases that discuss the general contract law proposition that a non-party to a contract lacks standing to challenge the validity of that contract. This tenet of contract law does not apply here, where JTC and Kerr are required to demonstrate as an element of their claim against the City that they had a property interest of value for the City to take. *Cf. Stigers v. City of St. Joseph*, 166 S.W.2d 523, 527 (Mo. 1942) (in inverse condemnation case, "[t]he burden of proof rested upon the plaintiffs to establish the pleaded interest in the described real estate").

Point I is denied.

<u>A factual dispute exists as to whether the Lease terminated,<br>thereby precluding summary judgment</u>

---

[8] As discussed in further detail below regarding Point III, Kerr's claim of inverse condemnation, as pleaded in his Complaint in Intervention, only asserts a taking of the "rights to the use of his royalty property" and the right "to obtain the benefits of his lease"; he does not assert the City took his property right in his mineral estate.

In Point II, JTC and Kerr assert the trial court erred in granting summary judgment in that they presented evidence showing the wells did not cease production, thereby creating a genuine issue of material fact that precluded summary judgment. Alternatively, they contend that, under Missouri law, once a mineral lease has entered into its secondary term, it will not be found to have expired unless there is intentional and actual relinquishment of the premises, *i.e.*, the lease is abandoned. They argue that even if the wells did cease production, a genuine issue of fact exists as to whether the cessation was temporary or constituted abandonment. We agree that a factual dispute exists regarding the Lease's termination such that the trial court erred in granting summary judgment on this basis.

In support of its argument that the Lease had terminated for non-production, the City relied on the records of the State Oil and Gas Council, which the City asserted showed several time periods when the Lease was not producing oil. In response, JTC and Kerr submitted evidence showing that those records reflected sales, not production, and that the wells had continuously produced oil throughout the life of the Lease. This evidence included the affidavits of Tom Cain—president of JTC—and Kerr.

In his affidavit, Tom Cain stated the following regarding the State Oil and Gas Council records:

> 9. I am familiar with how Missouri well production reporting works. Production is reported when sales occur. Typically, wells produce into 100+ barrel stock tanks, and a lease typically has one or more stock tanks. Oil is produced by the wells into the stock tanks and accumulated over a period of time. When the stock tanks are nearly full, the oil is picked up by the purchaser in a truck who then measures the amount taken and it is that amount that is reported to the state.
>
> 10. The wells that were located on the lease when JTC acquired it were wells that produced only a small amount—a fraction of a barrel per day. As a result, it took extended periods of time to fill the stock tanks with oil for a sale. Thus, although the wells did not stop producing, the state records reflected only the sporadic sales, instead of the continual production. It would have been physically impossible for

10

the three wells on the property to have produced the amount of oil shown in the production records only in the months in which it was sold.[9] The production [sic] thus consistently reflects lease production occurring over a period of months or years.

Cain also addressed the wells' production behavior prior to JTC's acquisition of the Lease:

4. When JTC acquired the properties, the wells were capable of, and were producing oil at the rate of only a fraction of a barrel of oil a day. The wells were equipped with pumpjacks that were running on timers, enabling the fluid that would flow into the wellbore to be raised, and keeping the operating costs very low. The production characteristics of these wells [(which were the wells that had been on the property for the duration of the Lease)] are consistent with other wells in this formation that I have operated, such that these wells seemed to behave consistent with their behavior for the past several years.

JTC and Kerr also provided evidence of continuous oil production in the form of Kerr's affidavit, in which he stated that at all times since he purchased the property in January 1988—which we note is prior to the first period of non-production found by the trial court—"oil was continuously produced" from the lands covered by the Lease and he "continuously and periodically received his share of the royalties payable under the Lease."[10]

We find that this evidence creates a genuine issue of material fact as to whether the oil wells failed to produce oil throughout the life of the Lease, and that the trial court erred in determining JTC and Kerr failed to produce "any evidence that any production occurred during the lapse periods reported on [the State Oil and Gas Council records]." Because JTC and Kerr demonstrated that the material facts shown by the City were genuinely disputed, the City was not entitled to summary judgment on the basis that the Lease terminated.

---

[9] For example, the records show no "produced oil" from February 1988 through August 1989, 118 barrels of "produced oil" in September 1989, and 157 barrels of "produced oil" in October 1989.

[10] After the trial court affirmed the City's decision to deny JTC's application, JTC "plugged and abandoned the remaining wells, remediated the property and released the lease." Kerr stated that he received his share of the royalties payable under the Lease and the Lease continuously produced oil until that time.

11

The City argues that we should affirm the trial court's grant of summary judgment because, "[e]ven if [JTC and Kerr] were able to show the production records reflected some minimal production, courts traditionally require the oil to be produced in paying quantities, which it was not." While we agree that the relevant inquiry is whether the Lease produced in paying quantities, we do not agree that we can affirm on the ground that the Lease failed to produce oil in paying quantities.

The majority of courts interpret "production" to mean "production in paying quantities," and "imply a 'paying quantities' requirement even when the lease does not expressly require it." Jessica E. McDonald & Zachary M. Wallen, *Defining "Production in Paying Quantities": A Survey of Habendum Clause Cases Throughout the United States*, 90 N.D. L. Rev. 383, 387 (2014); *see also* 3 Williams & Meyers, *Oil & Gas Law* § 604.5 (2019) (noting that the "vast majority of courts have construed the word 'produced' in the 'thereafter' provisions to mean 'produced in paying quantities,'" which stems from the objective of mineral leases: "not merely to have oil or gas flow from the ground but to obtain production that is commercially profitable to both parties."). An analysis of whether a lease produces in paying quantities involves, at a minimum, consideration of whether the lessee makes a profit over its operating expenses. *See* McDonald & Wallen, *supra*, at 388 ("Courts now nearly universally agree that a well produces in 'paying quantities' when it 'pays a profit, even a small one, over the operating expenses.'").

As a defending party seeking to establish a right to summary judgment, the City had the burden to show that the Lease terminated for failure to produce in paying quantities. *See ITT Commercial Fin. Corp.*, 854 S.W.2d at 381. The summary judgment record before us is insufficient to allow us to make such a determination, as there is no evidence regarding the lessees' operating expenses or the profits made during the time periods alleged to be periods of "non-

12

production." As such, we cannot determine, as a matter of law, that the Lease failed to produce oil in paying quantities during the time periods in question.

JTC and Kerr have set forth an additional argument for reversing the trial court's judgment, which is that the trial court erred in finding the Lease terminated for lack of production without determining whether the periods of non-production were mere temporary cessations in production as opposed to abandonment of the Lease. Because we are reversing the judgment and remanding this action to the trial court, we deem it prudent to address this argument, as it appears the trial court conducted no such analysis.

"The production required to keep an oil and gas lease in effect during the secondary term obviously need not necessarily be continuous." Williams & Meyers, *supra*, § 604.4 (noting that courts in all jurisdictions adhere to the principle that a temporary cessation in production for reasons incidental to the normal operation of a lease will not cause termination of the lease). To that end, multiple jurisdictions have adopted the "temporary cessation of production doctrine," under which "[a] temporary cessation of production is excusable [and does not terminate the lease] if the period of cessation is not unreasonably protracted; if the reason for the period of cessation is incidental to the normal operation of the lease; and if it can be said that the possibility of such a period of cessation would be contemplated by objectively reasonable parties to such a lease." *See Bryan v. Big Two Mile Gas Go.*, 577 S.E.2d 258, 266 (W. Va. 2001).[11]

Although there is no case law in Missouri addressing the "temporary cessation of production doctrine," the Missouri Supreme Court has analyzed whether a mineral lease terminates by virtue of the lessee's abandonment of the lease. *See Aden v. Dalton*, 107 S.W.2d 1070 (Mo. 1937). In *Aden*, the Missouri Supreme Court stated that "[w]here a lessee enters upon the leased

---

[11] In *Bryan*, the Supreme Court of Appeals of West Virginia noted that by adopting the doctrine, it was "in line with what many other jurisdictions have done." 577 S.E.2d at 266.

premises and discovers oil or gas in paying quantities his right to produce the oil and gas becomes a vested right, and before such right can be divested it must be proven that he intentionally abandoned the premises, and has relinquished possession thereof." *Id.* at 1077 (citing *Archer's Law & Practice in Oil & Gas Cases*). "The abandonment must be intentional, and the relinquishment actual." *Id.* The Court further stated that "whether, in any case, the lease has been abandoned, depends upon the intent of the lessee" and "is to be determined by all the facts and circumstances surrounding each particular case." *Id.* at 1076 (citing *Mills & Willingham's Law of Oil & Gas*). In *Aden*, the Missouri Supreme Court reversed the trial court's judgment cancelling two mineral leases, finding the record did not "justify a conclusion that these leases were abandoned." *Id.* at 1077.

In light of the above, we agree with JTC and Kerr that, upon a finding that periods of non-production occurred, the inquiry then becomes whether the non-production constituted abandonment of the Lease, *i.e.*, did the lessee intentionally and actually abandon the premises and relinquish possession thereof, or was the non-production excusable under the temporary cessation of production doctrine.[12] Thus, it was error for the trial court to conclude that the Lease terminated for non-production without determining that the Lease was abandoned. *See Aden*, 107 S.W.2d at 1076-77.

Finally, the City argues that, even if we were to find a factual dispute exists as to whether the Lease terminated, we can affirm the trial court's judgment on the grounds that no "taking" occurred by the City. However, the City did not raise this ground in its motion for summary

---

[12] Under this doctrine, "[f]actors to be considered in deciding whether a period of cessation is excusable include the length of time without production, the reason for the period of cessation, and whether the lessee exercised reasonable diligence to resume production, bearing in mind the continuing affirmative duty of the lessee under such a lease to produce and market minerals to keep the lease in effect." *Bryan*, 577 S.E.2d at 266. "Whether a period of cessation of production is excusable under the foregoing standards and thus does not result in the automatic termination of a lease is ordinarily a question for the jury or other finder of fact." *Id.*

14

judgment, instead it relied only on its argument that the Lease terminated. Thus, we decline to address this claim on appeal. *See Altidor v. Broadfield*, 576 S.W.3d 272, 282 (Mo. App. E.D. 2019) ("[W]e can only affirm the summary judgment on a ground that *was actually raised in the motion and supported by the summary judgment record*." (emphasis added)); *see also Burian v. Country Ins. & Fin. Servs.*, 263 S.W.3d 785, 788 (Mo. App. E.D. 2008) ("Because we affirm the trial court's grant of summary judgment if it could have been based on any ground raised in the motion . . . we must determine whether [the issue] was raised in the motion for summary judgment[.]").

Point II is granted.

### We need not resolve whether the trial court erred in dismissing Kerr's claim as derivative of JTC's

In Point III, Kerr asserts the trial court erred in dismissing his claim as derivative of JTC's claim, arguing that "whether leased or not leased, the City's destruction of the ability to drill or to license anyone else to drill for oil on the property constituted a destruction of Mr. Kerr's mineral estate." Because we are reversing the trial court's judgment dismissing JTC's and Kerr's claims, we need not resolve this allegation of error.[13]

**Conclusion**

We reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.

---

[13] We note, however, that regardless of how Kerr characterizes his claim on appeal, he is bound by the allegations in his Complaint in Intervention. His Complaint in Intervention contains no allegation that the City's actions "constituted a destruction of Mr. Kerr's mineral estate." Rather, his allegations regarding the City's "taking" of his property are that the City's denial of JTC's application constituted a taking of the "rights to use of his royalty property" and "to obtain the benefits of his lease."

15