**FILED**

**October 21, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia ex rel.
TH Exploration II, LLC and Tug
Hill Operating, LLC,
Petitioners,**

**vs.) No. 21-1004** (Marshall County, 18-C-227 and 18-C-220)

**Venable Royalty, LTD; V14, LP;
Venro, LTD; V2, LP; and The
Honorable Judge Jeffrey Cramer, Judge
of the Circuit Court of Marshall County,
West Virginia
Respondents.**

## MEMORANDUM DECISION

Petitioners herein seek a writ of prohibition to halt the enforcement of a November 10, 2021, decision of the Circuit Court of Marshall County. [1] The order at issue granted summary judgment to Venable Royalty, Ltd., V14, LP, Venro, Ltd. and V2 LP (hereinafter the "Venable Respondents") [2] on the issue of royalty calculations. [3]

This Court has carefully considered the parties' briefs, oral arguments, and the appendix record, and concludes that Petitioners have not met the standard for the

---

[1] Petitioners are represented by counsel Thomas C. Ryan, Travis L. Brannon, and Emily C. Weiss of K&L Gates LLP.

[2] The Venable Respondents are represented by James Holmes of Holmes PLLC and John F. McCuskey of Shuman, McCuskey & Slicer, PLLC.

[3] In addition, we wish to acknowledge the amicus curiae brief submitted by the Gas & Oil Association of West Virginia in support of Petitioners as well as the amicus curiae brief submitted by the West Virginia Royalty Owners' Association, West Virginia Farm Bureau and Bounty Minerals LLC in support of the Venable Respondents. We value these organizations' contributions to this case and have considered their briefs in conjunction with the parties' arguments.

1

issuance of a writ of prohibition in this case. Accordingly, we deny the requested writ of prohibition. Because there is no substantial question of law, a memorandum decision is appropriate pursuant to Rule 21 of the West Virginia Rules of Appellate Procedure.

This case involves a dispute regarding the calculation of royalties paid by Petitioners to the Venable Respondents. Petitioners are the successors to lessors' royalty rights and mineral interests in fifteen (15) leases (hereinafter "Leases"). Petitioners acquired the Leases from Gastar Exploration USA, Inc. (hereinafter "Gastar") in 2016.[4] Prior to the acquisition, Gastar drilled and/or operated oil and gas wells pursuant to the Leases and paid royalties to the Venable Respondents. After Petitioners' acquisition, Petitioners began paying royalties to the Venable Respondents.[5]

With the exception of the royalty percentage[6], all fifteen leases contain the following royalty provision:

---

[4] Prior to Petitioners' acquisition, Gastar conveyed 50% of its interest in the leases to Atinum Marcellus I LLC (hereinafter "Atinum"), a nonoperating, partial working interest owner. In 2021, Petitioners acquired Atinum's 50% interest in the fifteen leases so that Petitioners now own 100% of the leases. The Assignment and Bill of Sale to Tug Hill Exploration II, LLC was dated April 7, 2016, but it was effective January 1, 2016 and recorded on April 27, 2016.

[5] Petitioners succeeded to the rights of Gastar in several gas-marketing contracts and also entered into other third-party contracts. Although not exhaustive, contracts mentioned in the circuit court's order are: (1) 2010 Gas Purchase Agreement in which Gastar and Atinum engaged SEI and agreed to sell and relinquish title to their equity gas and the Venable Respondents' royalty gas at Delivery Points; (2) 2010 Gas Gathering Agreement; (3) 2010 Condensate Gathering Agreement; (4) 2014 Gathering, Processing, Dehydrating and Treating Agreement (hereinafter "2014 Gathering Agreement"); (5) 2016 NAESB Contract; (6) 2018 Liquids Contract; and (7) 2020 Confirmation.

[6] Some of the Leases provide for a 17 percent royalty, while others provide for a one-eighth (1/8th) royalty.

2

Royalty Provision

Royalty Payments: The royalties reserved by Lessor, and which shall be paid by Lessee, are: (a) an oil (including but not limited to distillate and condensate) [respective royalty rate] of that produced and saved from the lease premises, the same to be delivered at the wells or to the credit of Lessor in the pipeline to which the wells may be connected, provided; however, Lessee, at its option, may from time to time purchase the royalty oil, paying not less than the price prevailing in the pricing area for oil of like grade and gravity at the time of delivery; (b) on gas, including casinghead gas and all other gaseous or vaporous substances, produced from the Land and sold or used off the lease premises or in the manufacture of gasoline or in the extraction of sulphur or any other product, the market value at the wells of [respective royalty rate] of the gas sold or used, with the market value at the wells in no event to exceed the net proceeds received by Lessee calculated or allocated back to the wells from which produced, making allowance and deduction for a fair and reasonable charge for gathering, compressing, and making the gas merchantable, provided, that on gas sold at the wells, the royalty shall be [respective royalty rate]of the net proceeds received by Lessee from the sale, all allowance and deductions, and provided further that, if any sale of gas is regulated as to price by any governmental agency having the jurisdiction, the market value or net proceeds shall in no event exceed the amount received by the Lessee, not subject to refund, calculated, or allocated back to the wells from which produced, making allowance and deduction for a fair and reasonable charge for gathering, compressing, and making the gas merchantable, and which amount may be further adjusted up or down prospectively or retrospectively when the price of rate authorized by the governmental agency is finally determined; (c) on sulphur extracted and marketed, One Dollar ($1.00) per long ton. Lessor agrees to pay any and all taxes levied or assessed on Lessor's interest in the production of oil, gas and sulphur from the lease premises

3

and Lessee is authorized to pay the taxes and assessments on behalf of Lessor and to deduct the amount so paid from any monies payable to Lessor. In the event any extraneous substance (being any substance that is obtained from sources other than the lease premises or lands pooled or unitized with the lease premises) is injected into subsurface strata in connection with secondary, tertiary, or other enhanced recovery operations, any like substance thereafter produced, or contained in oil or gas produced from the strata shall be deemed to be part of the extraneous substance injected until the total volume equals the total volume of the extraneous substance injected, and no royalty shall be payable on any extraneous substance. Lessee shall not be obligated to make payment to any individual payee or agent hereunder until such payment equal the sum of Twenty Five and no/100 Dollars ($25.00), but in any case, payment shall be made at least once each calendar year.

Petitioners began paying royalties to Respondents in 2016, with Petitioners deducting certain post-production costs from the royalties. On or about September 28, 2018, the Venable Respondents filed a complaint against Petitioners alleging that such deductions resulted in Petitioners breaching the Leases.[7] The Venable Respondents sought monetary damages and declaratory judgment.

According to Petitioners, there is no dispute as to the manner in which the royalties at issue were calculated. The only dispute is whether the royalty calculation complies with West Virginia law. To understand this dispute, we must examine the Leases and related contractual documents and the manner in which Petitioners sell gas and related products. Since acquiring the Leases at issue, Petitioners operate and produce a "wet gas," which means that there are carbon liquids contained in the unprocessed gas stream. The gas and condensate produced under the Leases flows through the Williams Ohio Valley Midstream LLC (hereinafter, "Williams OVM")

---

[7] The complaint was amended several times with the most recent amendment being the Fifth Amended Complaint, which was filed on or about January 30, 2020. The Fifth Amended Complaint includes additional parties that are not involved in this appeal.

facilities and plants.[8]  The wet gas and condensate streams are conveyed by separate gathering lines that lead to the inlet of the local processing facilities and plants owned and operated by Williams OVM.  There are two entry points to the Williams OVM facilities that are relevant to this case:  Corley and Burch Ridge.

Relating to Corley and Burch Ridge, Petitioners had written contracts with a single marketing company (first, SEI Energy, LLC ("SEI") and subsequently, Williams Energy Resources, LLC (hereinafter "WER") that govern the transactions between those parties.[9]  Petitioners contend that pursuant to their contract with WER, WER agreed to purchase unprocessed gas at Corley and Burch Ridge.  WER is Petitioner's only purported recipient of gas at Corley and Burch Ridge. Respondents dispute this contention and argue that Petitioners do not sell any gas at Corley and Burch Ridge. Respondents contend that Petitioners actually sell processed gas products further downstream at the TETCO market and at plant tailgates in the Williams OVM system.[10]

According to Petitioners, after the purported sale at Corley or Burch Ridge, WER incurred costs to process the wet gas into residue and natural gas liquids (hereinafter "NGLs").  Petitioners further allege that WER sold the residue gas at an interstate pipeline (presumably TETCO), and either sold the NGLs at the plant tailgate or returned them in-kind to Petitioners.  WER then "netted back" the costs it incurred after the point of sale and paid Petitioners its proceeds from the sale of the unprocessed gas stream's products.  WER provided an aggregate monthly statement rather than allocating the price per product when purchasing the unprocessed gas at Corley or Burch Ridge.   Therefore, Petitioners used an internal reconciliation process to allocate the lump sum amount received from WER to each product produced from and traceable to the oil and gas molecules produced from each well drilled on the Leases.  Petitioners state that they calculate the Venable Respondents' royalties based on the gross proceeds that they receive from WER's sale of the products of the unprocessed gas stream.

On or about May 8, 2020, the Venable Respondents filed a motion for summary judgment seeking the following relief:  (1) that Petitioners be ordered to

---

[8] This excepts a small volume of field condensate falling out at well sites.

[9] SEI and WER are sometimes referred to as "Marketer."

[10] TETCO stands for the Texas Eastern interstate pipeline system, which runs along the northeastern part of the United States.

alter their current royalty-accounting practices to ensure that post-production costs incurred prior to the TETCO market for residue gas, the plant-tailgate market for NGLs and plant-made condensate, and the field market for field condensate not be assessed against Respondents' royalties moving forward; (2) that Petitioners be ordered to prepare an accounting showing the post-production costs that have reduced Respondents' respective royalties and provide prompt reimbursement for the amounts that were improperly allocated against Respondents' royalty payments; and (3) that Petitioners be ordered to pay the Respondents pre-judgment interest on such amounts.[11]

Petitioners filed a cross-motion for summary judgment. A hearing on the outstanding motions for summary judgment was held on October 23, 2020, and by order entered on November 10, 2021, the circuit court granted the Venable Respondents' motion for summary judgment and denied Petitioners' motion. Specifically, the circuit court's Order required Petitioners to: (1) alter the manner in which they pay royalties to Respondents so that it is consistent with the court's opinion; (2) alter their royalty accounting practices to prevent royalty payments to Respondents from bearing post-production costs incurred or assessed prior to the (a) TETCO M2-region market for residue gas, (b) the Williams Plant tailgate market for NGLs and condensate coming through the plant system, and (c) the field market for skim oil that does not go through the plant system; and (3) prepare an accounting as contemplated in *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001)*,* which shows, by category and amount, the post-production costs from the Williams Plants (or predecessor Caiman Plants) that have reduced Respondents' respective royalties.[12] The circuit court further ordered that upon completion of the above requirements, Respondents may file for determination of pre-judgment interest.

The present Petition for Writ of Prohibition to this Court followed.

We begin our analysis of this request for extraordinary relief by noting "[t]his Court is restrictive in the use of prohibition as a remedy." *State ex rel. W. Va. Fire & Cas. Co. v. Karl*, 199 W. Va. 678, 683, 487 S.E.2d 336, 341 (1997). When

---

[11] The Venable Respondents' motion sought summary judgment on "certain liability issues, leaving for later determination the resolution of all liability issues, as well as [their] entitlement to damages and attorney's fees."

[12] Once Respondents and/or the Court are satisfied that Petitioners' accountings are accurate, Petitioners must promptly reimburse Respondents for the amounts that were improperly allocated against their royalty payments.

presented with a petition requesting prohibitory relief, this Court has held that "[a] writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. W. Va. Code, 53-1-1." Syl. Pt. 1, *State ex rel. PrimeCare Med. Of W. Va., Inc. v. Faircloth,* 242 W. Va. 335, 835 S.E.2d 579 (2019) (quoting Syl. Pt. 2, *State ex rel. Peacher v. Sencindiver*, 160 W. Va. 314, 233 S.E.2d 425 (1977)).

Petitioners do not allege that the circuit court acted without jurisdiction. Instead, they argue that the circuit court exceeded its legitimate powers. Therefore, we will look to the factors this Court has previously established to determine if a writ of prohibition should issue:

> (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. Pt. 4, in part, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996). "In determining the third factor, the existence of clear error as a matter of law, we will employ a *de novo* standard of review, as in matters in which purely legal issues are at issue." *State ex re. Gessler v. Mazzone*, 212 W. Va. 368, 372, 572 S.E.2d 891, 895 (2002).

Petitioners contend that our failure to issue a writ of prohibition at this time "has the potential to perpetuate the 'chaos' that currently exists in West Virginia royalty jurisprudence and to cause confusion for all oil and gas producers in the state." We disagree.

7

Petitioners contend that all five of the *Hoover* factors weigh in their favor. Importantly, the first factor of *Hoover* directs us to determine whether Petitioners have another adequate remedy, such as direct appeal, to obtain the relief they desire. *See* Syl. pt. 4, in part, *Hoover*, 199 W. Va. 12, 483 S.E.2d 12.   We conclude that Petitioners do, indeed, have such an adequate remedy by way of a direct appeal of the circuit court's final order when such order is issued. Petitioners contend that they cannot directly appeal at this time because a trial or evidentiary hearing on damages is still necessary to obtain a final order, and that requiring this case to proceed to such a hearing would cause unreasonable expense and delay.  Although Petitioners later argue that they might have to retain expert witnesses to calculate damages, their arguments with respect to the expenses are general and without adequate support.

The cases Petitioners rely upon in support of this factor are distinguishable from the present case.  In *State ex rel. Frazier v. Hrko*, 203 W. Va. 652, 510 S.E.2d 486,  (1998), the parties would have been compelled to go through an expensive, complex trial.  In the instant case, Petitioners state only that a trial or hearing on *damages* would be necessary to obtain a final order.  Further, in *State ex rel. Frazier v. Hrko*, this Court concluded there was a "high likelihood of reversal on appeal," which we are unable to conclude at this stage in the instant case. *Id* at 658, 510 S.E.2d 486, 492.  The Venable Respondents argue that Petitioners have another means for obtaining their desired relief.  According to the Venable Respondents, discovery and pre-trial litigation should continue so that a meaningful appeal can take place. [13] The order that Petitioners seek to prohibit does not terminate all litigation between the parties on the merits of the case.  Petitioners clearly have the remedy of a direct appeal available to them after the circuit court enters a final order.

The mere fact that Petitioners will be required to recalculate the royalties previously paid in this matter does not render its ability to appeal the final order of the circuit court in this matter an inadequate remedy as envisioned in *Hoover*. Indeed, any damage incurred by Petitioner would be monetary in nature and, if erroneous, could be remedied on direct appeal.  This court has made abundantly clear that a writ of prohibition is an *extraordinary* remedy that should not be used as a substitute for a direct appeal:

---

[13] The Venable Respondents contend that a determination needs to be made as to whether the Residue Gas and NGL portion of the Leases (clause 5(b)) or the Condensate portion (clause 5(a)) contains the greater amount in controversy.

As we have repeatedly stated, "[o]ur law plainly states that a writ of prohibition may not be used as a substitute for appeal." *State ex rel. Shelton v. Burnside,* 212 W. Va. 514, 518, 575 S.E.2d 124, 128 (2002); *see also State ex rel. Maynard v. Bronson,* 167 W. Va. 35, 41, 277 S.E.2d 718, 722 (1981)("[P]rohibition cannot be substituted for writ of error or appeal unless a writ of error or appeal would be an inadequate remedy.")

*State ex re. Howell v. Wilmoth,* No. 19-0065 (W.Va. Supreme Court, November 5, 2019) (memorandum decision) at *3. Because we find that a direct appeal would be an adequate remedy, the first factor of the *Hoover* test weighs against the issuance of the requested writ.

Although the presence of an adequate remedy absent an extraordinary writ is dispositive in this case, we nonetheless find that the Petitioners have failed to establish that the remaining factors set forth in *Hoover* weigh in favor of the requested writ. The second *Hoover* factor directs us to consider whether Petitioners will be damaged or prejudiced in a way that is not correctable on appeal. *See* Syl. pt. 4, in part, *Hoover*, 199 W. Va. 12, 483 S.E.2d 12. Petitioners' argument with respect to this factor is focused on the expenses that they may incur in order to calculate damages, not whether any such damage they would allegedly incur in making such calculation can be corrected on appeal. Specifically, Petitioners contend that without our intervention at this point, they will be saddled with the burden of calculating damages via an accounting which they allege will likely involve the additional expense of expert witnesses. However, what Petitioners are actually required to prepare is an accounting showing "by category and amount, the post-production costs from the Williams plants (or predecessor Caiman Plants) that have reduced [the Venable Respondents'] respective royalties." Importantly, the second *Hoover* factor does not ask us to merely consider whether Petitioners will be in some way burdened. Instead, it directs us to consider whether Petitioners will be *damaged or prejudiced in a way that is not correctable on appeal.* In support of their argument that this factor weighs in their favor, Petitioners argue that they will be required to change the method by which they calculate royalties and will also be forced to implement new business practices to comply with the calculation of royalties. First, we note that it is not clear from the record whether the burdens complained of would extend beyond the specific Leases at issue in this case. Regardless, the expenses regarding such calculations that Petitioners rely upon are speculative and are monetary in nature and, thus, could be corrected on appeal.

9

Therefore, these concerns and speculations are not sufficient to meet the second *Hoover* factor. *Id.*

The third *Hoover* factor is met only if the circuit court's order is clearly erroneous as a matter of law. *Id.* Here, Petitioners contend that the circuit court clearly erred by denying their motion for summary judgment and by granting the Venable Respondents' motion for summary judgment. Specifically, Petitioners argue that the circuit court failed to apply existing West Virginia law by disregarding the express language of the Leases or significantly expanding the application of existing West Virginia law.

Petitioners argue that the circuit court's conclusions are clearly erroneous as a matter of law. Arguably, some of the court's specific findings may not be essential to its ultimate conclusion, which appears to be primarily based on contractual terms. Nonetheless, we are unable to conclude at this stage that the court's order was clearly erroneous as a matter of law. Despite Petitioners' arguments to the contrary, we conclude that the circuit court's consideration of Petitioners' third-party contracts is relevant. The circuit court's order thoroughly explains the relationships between the parties as well as Petitioners' third-party sales contracts and related marketing activity in reaching its decision to grant the Venable Respondents' motion for summary judgment and to deny Petitioners' motion. The circuit court concluded that, at the time of its order, the four live contracts were: (1) the 2014 Gathering Agreement; (2) the 2016 NAESB Contract; (3) the 2020 Confirmation; and (4) the 2018 Liquids Contract.

The third-party contracts involved in this case are a significant source of contention, with Petitioners arguing that the Venable Respondents' emphasis on the third-party contracts is a diversion from what Petitioners believe is the circuit court's true legal errors. Respondents contend, however, that in the instant case as well as in all royalty-underpayment cases, the "lessee's third-party sales contracts and related marketing activity constitute the most important evidence."

After a thorough review of the Leases, the circuit court looked to third-party contracts to determine points of sale for residue gas, NGLs and plant condensate. With respect to "points of sale," the circuit court concluded that Petitioners' 2016 NAESB Contract and 2020 Confirmation establish a point of sale at TETCO for Residue Gas. Further, the court found that 2014 Gathering Agreement and the 2018 Liquids Contract establish points of sale at plant tailgates for NGLs and plant condensate.

10

The circuit court's decision was based largely upon lease and contract interpretation, and Petitioners have failed to demonstrate that the circuit court's interpretation of such leases and contracts along with Petitioners' marketing activity, constitutes clear error as a matter of law.

Because the circuit court's decision was based largely upon contract interpretation, Petitioners are also unable to satisfy the fourth and fifth *Hoover* factors. Under the fourth *Hoover* factor, Petitioners must show that the circuit court's order is "an oft repeated error or manifests persistent disregard for either procedural or substantive law." *Id.* Petitioners do not allege that the circuit court's order is an oft repeated error. Instead, they contend that the order shows a disregard for the law of our state by redefining "market" in the application of the implied duty to market. We are not persuaded by Petitioners' argument in this regard as we have concluded that the decision at issue was based largely upon specific contract interpretation. Likewise, the final factor of the *Hoover* test asks us to examine whether the circuit court's order "raises new and important problems or issues of law of first impression." *Id.* Petitioners fail to satisfy this factor because the decision at issue largely interprets the specific leases and third-party contracts and marketing activity unique to this action rather than raising new and important problems or issues of law.

Petitioners have failed to establish that the circumstances present in this case render them unable to address the errors they have raised on direct appeal, and they, therefore, have failed to demonstrate that they have no other "adequate means" to seek relief. Moreover, they have failed to demonstrate to this Court's satisfaction that the circuit court's order was clearly wrong as a matter of law. We, therefore, conclude that Petitioners have failed to establish that they are entitled to prohibitory relief in this case. Accordingly, the requested writ is hereby denied.

Writ denied.

**ISSUED**: October 21, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Judge Richard A. Facemire sitting by temporary assignment.

Justice C. Haley Bunn, deeming herself disqualified, did not participate.